**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

David Streever,[1]

         *Plaintiff*,

    v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528;

DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, 500 12th St. SW, Washington, DC 20536;

JENNIFER M. FENTON, in her official capacity as Associate Director, Office of Professional Responsibility, U.S. Immigration and Customs Enforcement, 500 12th St. SW, Washington, DC 20536;

JOHN DOE, in his official capacity as Special Agent in Charge – East, Office of Professional Responsibility, U.S. Immigration and Customs Enforcement, 500 12th St. SW, Washington, DC 20536;

DAVID BRODIE in his official capacity as Special Agent, U.S. Immigration and Customs Enforcement, 500 12th St. SW, Washington, DC 20536;

ABBI HENRY in her official capacity as Special Agent, U.S. Immigration and Customs Enforcement, 500 12th St. SW, Washington, DC 20536;

TREVOR J. PITTS in his official capacity as Special Agent, U.S. Immigration and Custom Enforcement, 75 N. Hangar Rd., Ste. 217, Jamaica, NY 11430,

        *Defendants*.

Civil Action No. 1:26-cv-02356

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

JURY TRIAL DEMANDED

(Rule 57 Speedy Hearing Request)

---

[1] As permitted by Local Civil Rule 5.1(c), Plaintiff Streever is simultaneously filing under seal a notice containing his full address.

**INTRODUCTION**

1.      The First Amendment freedom to speak out in opposition to "police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston v. Hill*, 482 U.S. 451, 462–63 (1987).

2.      The Department of Homeland Security (DHS) is actively threatening that freedom, tracking down and retaliating against speakers like Plaintiff David Streever because he exercised his fundamental right to criticize one of the highest-ranking law enforcement officers in the United States. Our Constitution does not tolerate such a brazen abuse of authority.

3.      In January of 2026, Operation Metro Surge—an Immigration and Customs Enforcement (ICE) operation in Minnesota, which DHS boasted was the "largest immigration enforcement operation ever"—spurred national outrage when agents shot and killed two police observers.

4.      Streever is among the untold millions of Americans who participated in the public discussion about ICE's conduct.

5.      Streever sent a three-paragraph email (**Exhibit 1**) to Todd M. Lyons, then the embattled Acting Director of ICE, decrying the conduct of ICE's agents, drawing comparisons to Nazi Germany, and predicting Lyons' conscience would haunt him.

6.      Five months later, ICE agents armed with dossiers on critics and their commentary embarked on a trip across New York to confront and threaten critics of ICE, including Streever.

7.      ICE Special Agents David Brodie and Abbi Henry visited Streever's house in Rochester, learning from his wife that Streever was on a trip to Northern Europe with his seven-year-old daughter. The agents told Streever's wife that he "may or may not have sent an email threatening" the Director of ICE and left her with an ominous "WARNING NOTICE" for Streever

(**Exhibit 2**) declaring "YOU MAY BE IN VIOLATION OF FEDERAL LAW" because of "an email sent to Acting ICE Director Todd Lyons." The notice insisted that Streever "discontinue" his "behavior," and called for Streever to sign it and return it to ICE.

8. And still, DHS officials were not satisfied. When Streever and his daughter returned to America days later, a third DHS agent tracked them to a New York City hotel, where a hotel clerk roused Streever from his sleep to tell him a federal agent was looking for him. The agent also gave the clerk his business card to give to Streever, who soon discovered voicemails from two "Homeland Security Investigations" callers who did not provide their names.

9. Streever is not the only person to have received such a notice in recent days. Special Agents Brodie and Henry also confronted a Syracuse resident on June 23—the same date the agents attempted to confront Streever at his home in Rochester—by visiting her while she was volunteering at a polling place during New York's primary elections to deliver a similar "WARNING NOTICE" regarding her speech relating to the Minnesota ICE operation.

10. ICE's issuance of formal "WARNING NOTICE" documents to critics who engage in protected speech—and its decision to have federal agents deliver those warnings in person— can have only one purpose: to systemically chill ICE's critics and coerce them into silence.

11. Defendants are defying our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even when it means "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That includes law enforcement officials who, in our free country, "may reasonably be expected to exercise a higher degree of restraint than the average citizen" in response to "criticism and challenge directed at police." *Hill*,

2

482 U.S. at 461–62 (internal quotation marks omitted). The unconstitutional tactics of ICE and its agents merit swift correction.

12.    This Court should enjoin Defendants' unconstitutional actions to protect Streever's First Amendment rights and forestall the intended chilling effect those abuses will have on others.

## JURISDICTION AND VENUE

13.    This action arises under the First Amendment to the U.S. Constitution and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

14.    This Court has jurisdiction under 28 U.S.C. § 1331 and the First Amendment to the U.S. Constitution.

15.    The Court has authority to issue the requested relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

16.    Subject matter jurisdiction exists under Article III because Plaintiff Streever has suffered and will continue to suffer injuries-in-fact, there is a sufficient causal connection between Plaintiff Streever's injuries and Defendants' actions, and a favorable decision from this Court granting Plaintiff relief will redress those injuries.

17.    This Court also has authority to enjoin unlawful official action that is ultra vires, *see, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief"), or that violates the Constitution, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Federal courts have equitable power to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

3

18.     This dispute is ripe because Defendants are violating Plaintiff Streever's constitutional rights, and Streever will suffer further imminent invasions of those rights in the absence of relief from this Court.

19.     Venue is proper under 28 U.S.C. § 1391(e)(1) because one or more of the Defendants is an officer of the United States or an agency of the United States and resides in the District of Columbia. Venue is also proper because a substantial part of the events giving rise to Plaintiff's claims occurred in the District. *Id.*

## PARTIES

*Plaintiff*

20.     Plaintiff David Streever ("Streever") is a citizen of the United States and a resident of Rochester, New York.

21.     Plaintiff Streever is an author, journalist, and father of two children, including a seven-year-old daughter.

22.     Plaintiff Streever is married to the Rev. Hilary Streever, an Episcopal priest.

23.     Plaintiff Streever has never been arrested or charged with any offense, save for the possibility of minor traffic offenses.

*Defendants*

24.     Defendant **Markwayne Mullin** ("Mullin") is sued in his official capacity as Secretary of the Department of Homeland Security ("DHS").

25.     DHS is an executive department of the United States. 6 U.S.C. § 111(a). U.S. Immigration and Customs Enforcement ("ICE") is a component of DHS. *See* 6 U.S.C. § 252(a).

4

The Office of Professional Responsibility ("OPR") is a component of ICE. *See* 6 U.S.C. § 253. OPR investigates "internal and external threats" and "monitors threat levels at ICE headquarters."[2]

26.     DHS maintains, controls, and may withdraw or correct official DHS and ICE communications and can direct its components (including ICE and OPR) not to issue, rely on, or threaten enforcement based on notices promulgated by the DHS component.

27.     As alleged here, DHS, ICE, and OPR have routinely targeted their critics engaging in protected speech, including making threats to prosecute protestors and observers, using excessive force against the same, abusing the legal process in attempts to unmask internet critics, and tracking down and issuing coercive and retaliatory "WARNING NOTICE" writs to ICE critics.

28.     Defendant Mullin performs his official duties in Washington, D.C.

29.     As the "head" of DHS, Defendant Mullin has "direction, authority, and control over" its functions. 6 U.S.C. § 112(a)(2). Accordingly, "[a]ll functions of all officers, employees, and organizational units of [DHS] are vested in" Defendant Mullin. 6 U.S.C. § 112(a)(3). Defendant Mullin also has the statutory authority to "delegate any of the Secretary's functions to any officer, employee, or organizational unit of" DHS. 6 U.S.C. § 112(b)(1).

30.     In his official capacity, Secretary Mullin directs DHS and each of its component agencies, including ICE and OPR. Secretary Mullin has the authority to rescind, withdraw, disavow, or prohibit reliance on notices issued by ICE and OPR and to direct ICE and OPR to forego or cease any actions against Plaintiff Streever.

---

[2] *Office of Professional Responsibility (OPR)*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/opr (last visited July 4, 2026).

31. Defendant **David J. Venturella** ("Venturella") is sued in his official capacity as Senior Official Performing the Duties of Director of ICE. In this capacity, Venturella directs ICE and each of its component directorates, including OPR.

32. Defendant Venturella performs his official duties in Washington, D.C.

33. In his capacity as Senior Official Performing the Duties of Director of ICE, Defendant Venturella directs the administration of ICE's investigation policies and operations.

34. Defendant Venturella has the authority to rescind, withdraw, disavow, or prohibit reliance on notices issued by ICE and OPR and to direct ICE and OPR to forego or cease any actions against Plaintiff Streever.

35. Defendant **Jennifer M. Fenton** ("Fenton") is sued in her official capacity as Associate Director of the Office of Professional Responsibility ("OPR"), a directorate of ICE.

36. On information and belief, Defendant Fenton performs her official duties in Washington, D.C.

37. Defendant Fenton has the authority to rescind, withdraw, disavow, or prohibit reliance on notices issued by OPR and to direct OPR to forego or cease any actions against Plaintiff Streever.

38. Defendant **John Doe** ("Special Agent John Doe") is sued in his official capacity as Special Agent in Charge – East of the Office of Professional Responsibility, a directorate of ICE.

39. In his official capacity as Special Agent in Charge – East of the Office of Professional Responsibility, Defendant Special Agent John Doe oversees operations of OPR in the State of New York.

40. Special Agent John Doe's name is presently unknown to Plaintiff Streever. Plaintiff therefore sues this defendant by a fictitious name and will amend this Complaint to allege the

6

defendant's true name and identity when they are ascertained. Plaintiff is informed and believes, and on that basis alleges, that Defendant Special Agent John Doe is legally responsible in some manner for the events, conduct, acts, omissions, injuries, and damages alleged in this Complaint.

41.    Defendant **David Brodie** ("Special Agent Brodie" or "S.A. Brodie") is sued in his official capacity as Special Agent of ICE.

42.    Defendant **Abbi Henry** ("Special Agent Henry" or "S.A. Henry") is sued in her official capacity as Special Agent of ICE.

43.    Defendant **Trevor J. Pitts** ("Special Agent Pitts" or "S.A. Pitts") is sued in his official capacity as Special Agent of ICE.

44.    On information and belief, Special Agents Brodie, Henry, and Pitts are among the ICE officers assigned (among other things) to locate and confront people about their speech concerning ICE officials, including in the State of New York, using the "WARNING NOTICE" documents described in this Complaint.

## FACTUAL ALLEGATIONS

**Operation Metro Surge draws thousands of federal agents—and the public's eye—to Minnesota.**

45.    In December 2025, the Trump administration launched "Operation Metro Surge," a deployment to the Minneapolis area of over 2,000 federal agents—an immigration enforcement action DHS called "the largest DHS operation ever."

46.    Operation Metro Surge had a widespread impact on the Minneapolis populace, where nearly one third of the residents reportedly had at least one interaction with federal agents.

47.    On January 7, 2026, ICE agent Jonathan Ross, while participating in Operation Metro Surge, fired three shots at Renée Good, killing her.

48.    After firing the three shots, Ross called Good a "fucking bitch."

7

49.    Per the *Associated Press*, the shooting "quickly drew a large crowd of angry protesters."

50.    In the days that followed, the shooting drew widespread public furor, sparking over 1,000 protests across the nation the following weekend.

51.    Media reporting questioned whether the shooting was justified. For example, *The New York Times* and *ABC News* conducted video analyses concluding that two of the shots Ross fired were through the driver's side window of Good's vehicle as it moved past the agent.

52.    On January 24, 2026, a mere two weeks after Ross shot and killed Good, two federal agents participating in Operation Metro Surge shot and killed police observer Alex Pretti in Minneapolis.

53.    Media reporting questioned, as with the Good shooting, whether this shooting was justified. For example, *The New York Times* conducted a frame-by-frame video analysis, concluding that the videos appeared "to contradict the Department of Homeland Security's account of the encounter, which the agency said began after an individual armed with a handgun approached the federal agents with the intent to 'massacre' them." Bora Erden, et al., *Timeline: A Moment-by-Moment Look at the Shooting of Alex Pretti*, N.Y. Times (Jan. 25, 2026), https://www.nytimes.com/interactive/2026/01/24/us/minneapolis-shooting-alex-pretti-timeline.html.

54.    The *Times'* analysis indicated that Pretti was "holding his phone," not a gun, in his hand when he encountered the agents, that an agent "appears to pull a gun from near Mr. Pretti's right hip" and was "mov[ing] away" when "another agent unholsters his firearm and points it at Mr. Pretti's back," and that agents opened fire "while Mr. Pretti is on his knees and restrained." *Id.*

8

55. The Pretti shooting added to the public furor over ICE's operations in Minneapolis, again igniting protests across the United States.

56. Trump administration officials and DHS initially sought to brand Pretti a "domestic terrorist" who sought to "massacre law enforcement."

57. Those officials backed away from those characterizations when video of the incident indicated that Pretti had not drawn a weapon and had been disarmed before agents shot him.

58. The Pretti shooting and the federal government's response led multiple legislative officials to call for Secretary Noem's resignation, including Sens. Thom Tillis (who branded Noem "incompetent") and Lisa Murkowski.

59. The DHS response to the Pretti shooting reportedly led President Trump to remove then-Border Patrol Commander Gregory Bovino from Minnesota, winding down Operation Metro Surge.

**ICE and DHS take steps across the country to identify and threaten speakers over protected speech.**

60. In recent months, DHS and ICE, including the Office of Professional Responsibility, have undertaken efforts to identify internet users due to their protected speech.

61. By way of example, an October 2025 *Washington Post* article documented ICE attorney Joseph Dernbach's "misleading" claims in "ask[ing] a judge … to deport a father of two to Afghanistan, where he expects the Taliban to kill him."[3] Someone who read the article emailed ICE attorney Dernbach at his DHS email address to say: "Mr. Dernbach, don't play Russian

---

[3] John Woodrow Cox, *Trump Administration Makes Misleading Case in High-Stakes Asylum Hearing*, Wash. Post (Oct. 30, 2025), https://www.washingtonpost.com/investigations/2025/10/30/trump-asylum-afghanistan-deport-immigration.

roulette with [the man]'s life. Err on the side of caution. There's a reason the US government along with many other governments don't recognize the Taliban. Apply principles of common sense and decency." Decl. of Movant Jon Doe in Supp. of Mot. to Quash Admin. Subpoena, *Doe v. U.S. Dep't of Homeland Sec.*, No. 5:26-mc-80026 (N.D. Cal. Feb. 2, 2026), ECF No. 1-7 at ¶¶ 4–8.[4]

62.     Five hours later, the user received a notice from his email provider, Google, reporting that it had received an "Immigration Enforcement Subpoena" from DHS for his Google account information. *Id.* at ¶¶ 11, 24–25.

63.     Approximately two weeks later, two DHS agents and a uniformed police officer showed up at the user's home and interrogated him about the email and the opinions he expressed in the email. *Id.* at ¶¶ 30–38.

64.     After the user filed a motion to quash, DHS withdrew the subpoena. The user's notice of voluntary dismissal noted that DHS had engaged in a pattern of issuing subpoenas to unmask or harass its critics, only to withdraw those subpoenas following motions to quash, thereby avoiding potential adverse rulings. *See* Notice of Vol. Dismissal, *Doe v. U.S. Dep't of Homeland Sec.*, No. 5:26-mc-80026 (N.D. Cal. Feb. 10, 2026), ECF No. 8 at 3, n.1 (citing cases).[5]

65.     DHS has also targeted and threatened to prosecute others criticizing ICE and DHS and reporting on their activities.

---

[4]     Doe's declaration is available at https://storage.courtlistener.com/recap/gov.uscourts.cand.463612/gov.uscourts.cand.463612.1.7.pdf; the motion to quash is available at https://storage.courtlistener.com/recap/gov.uscourts.cand.463612/gov.uscourts.cand.463612.1.0.pdf.

[5]     The notice of dismissal is available at https://storage.courtlistener.com/recap/gov.uscourts.cand.463612/gov.uscourts.cand.463612.8.0_1.pdf.

66.     For example, even though the First Amendment protects photographing and taking videos of law enforcement performing their duties in public, and making the videos and photos public, DHS officials have threatened to prosecute those who do so.[6]

67.     Likewise, in a 2025 order issuing a preliminary injunction against the DHS Secretary, acting ICE Director, and other DHS officials, a federal judge recounted "drawing and pointing of weapons; the use of pepper spray and other non-lethal munitions; actual and threatened arrest and detainment of protesters and observers; and other intimidation tactics" by ICE agents against protestors and observers of ICE activities. *Tincher v. Noem*, 816 F. Supp. 3d 931, 969 (D. Minn. 2026).

**Streever sends an email to the Acting Director of ICE condemning his agency's defense of agents who shot Pretti.**

68.     On  January  26,  2026,  Plaintiff  Streever  sent  an  email  to Todd.M.Lyons@ice.dhs.gov,  the  publicly  available  government  email  address  for  then-acting director of ICE, Todd M. Lyons. A true and correct copy of Streever's email is attached as **Exhibit 1**.

69.     Streever sent the email using his true name and photograph.

70.     Streever's email, with the subject line "What's next," states in full:[7]

> You are a monstrous human being and will go down in history as America's Reinhard Heydrich, the butcher.
>
> The way you are protecting the obvious execution in Minnesota, even as we see the videos, will lead to your downfall. Even Trump will turn on you before the end, and

---

[6] Matthew Cunningham-Cook, *DHS Says Making and Posting Videos of ICE Agents Is "Violence"*, Exposed by Ctr. for Media & Democracy (Sept. 9, 2025, at 4:00 CT) https://www.exposedbycmd.org/2025/09/09/dhs-says-making-and-posting-videos-of-ice-agents-is-violence.

[7] Reinhard Heydrich, one of the principal architects of the Holocaust, was a high-ranking law-enforcement official in control of the Nazi regime's secret police.

you will be a sad, despised man who eats himself alive with shame at your own pathetic weakness.

You will never know peace. You will seek to lose yourself, to escape the burden of knowing the truth about yourself. But wherever you go, you will find yourself. You will torment yourself until your last day on Earth.

**Five months later, ICE agents hunt down and intimidate Streever because of his political speech, including issuing a threatening "WARNING NOTICE."**

71.    Five months after Streever emailed Lyons, two ICE Special Agents, Defendants Brodie and Henry, visited Streever's home.

72.    The Streever family's doorbell camera shows the agents on the Streevers' porch on Tuesday, June 23, 2026:



73.    The camera also shows one agent peering in the Streevers' windows:



74.    Streever's wife, the Rev. Hilary Streever, arrived at their Rochester home to discover Special Agents Brodie and Henry leaving their front porch.

75.    When Rev. Streever encountered Special Agents Brodie and Henry, she was still wearing her clergy collar.

76.    The agents told Rev. Streever that David Streever "may or may not have" sent an email to Todd Lyons, threatening Lyons, and needed to talk to David Streever.

77.    Rev. Streever informed the agents that Streever would not have sent a threat.

78.    Rev. Streever informed the agents that Streever was in Northern Europe and would return on Friday.

79.    The agents provided Rev. Streever with a document entitled "WARNING NOTICE."

80.    A true and correct copy of the "WARNING NOTICE" directed to Streever is attached as **Exhibit 2**.

13

81.     The "WARNING NOTICE" states, with emphasis in original, that "**YOU MAY BE IN VIOLATION OF FEDERAL LAW.**"

82.     The "WARNING NOTICE" states that ICE's "Office of Professional Responsibility (OPR) is responsible for protecting ICE" and its employees "against internal and external threats," and that OPR is "responsible for enforcing crimes against the United States … including criminal investigations into threats made against ICE personnel."

83.     The "WARNING NOTICE" further states: "OPR has identified an email sent to Acting ICE Director Todd Lyons, which it has reason to believe may constitute a violation of Title 18 of the U.S. Code. Accordingly, OPR is requesting that you **promptly remove and/or discontinue the aforementioned behavior**." (emphasis added).

84.     The "WARNING NOTICE" then states, with emphasis in original:

> *This Notice officially informs you that it is unlawful to threaten to assault, kidnap, and/or murder a federal official […] with the intent to impede, intimidate, and/or interfere with the federal official's duties or retaliate against a federal official due to the performance of their duties. 18 U.S.C. § 115(a). You are further advised that knowingly making restricted personal information about a covered person, or their immediate family member, publicly available with the intent to threaten, intimidate, or incite the commission of a crime of violence against that person; or with the intent and knowledge that the restricted personal information will be used to threaten, or intimidate, or facilitate the commission of a crime of violence against that person violates federal law. 18 U.S.C. § 119. Violations of these or related laws could subject you to both federal and state prosecution.*

85.     The "WARNING NOTICE" then goes on to state that OPR will "take[] into consideration" the "[r]eceipt of this Notice … should you **continue to be** involved in any criminal activities described above." (emphasis added).

14

86. The "WARNING NOTICE" calls for Streever to sign it, in a section titled "Acknowledgment of Recipient."

87. Although the "WARNING NOTICE" leaves a space for the Special Agent to identify themselves and provide their contact information, the signature field on the "WARNING NOTICE" delivered to Streever's wife was unsigned.

88. Streever's wife told the agents that Streever would return on Friday, June 26, 2026.

89. Instead of waiting for Streever to return on Friday, DHS or ICE sent a third agent to confront Streever on the night of Thursday, June 25, 2026.

90. On that Thursday, Streever and his daughter arrived at JFK International Airport from Finland, after which Streever and his daughter checked into a hotel in New York City.

91. At approximately 9:00 p.m. that evening, a hotel clerk awakened Streever and informed him that a DHS agent had appeared at the hotel looking for Streever.

92. The hotel clerk gave Streever a business card left by the Special Agent.

93. The business card identified the agent as Special Agent Trevor J. Pitts of the Jamaica, New York, office of Homeland Security Investigations of DHS.

94. Streever's wife had not informed the ICE agents, or anyone else, of the name of the hotel where Streever intended to stay.

95. Also that evening, Streever also received two voicemails from callers—one male, one female—who did not provide their names and identified themselves only as "Homeland Security Investigations."

96. The agents' visit to his home, repeated telephone messages, visit to his hotel, apparent surveillance of his travel, and claims that his email was a threat of violence have caused

Streever and his family anxiety and distress, including fear of further retaliation from ICE agents for his email or future criticism of ICE and DHS policies and actions.

97.    As he prepared to travel by Amtrak from New York City back to Rochester, Streever had to prepare his daughter for the possibility that the federal agents who had tracked him might confront them while they were on the Amtrak.

98.    Streever's seven-year-old daughter was frightened and cried, telling her father: "I don't want them to kill you."

99.    Streever is not the only recipient of a "WARNING NOTICE" in recent days.

100.    On Tuesday, June 23, 2026, while Syracuse resident Paigelynne Gonyea was volunteering as a poll worker during New York's primary elections, she received a voicemail from Special Agent Brodie, who stated he had just visited her apartment and was "calling in reference to a post we believe you made on Instagram, where you doxxed an ICE agent back in January."

101.    Special Agent Brodie and Special Agent Henry came to the polling place and handed Gonyea a "WARNING NOTICE" form regarding her Instagram account.

102.    That form that was substantially identical to the "WARNING NOTICE" form Brodie and Henry delivered to Streever's wife, likewise "requesting that you promptly remove and/or discontinue the aforementioned behavior."

103.    The "WARNING NOTICE" served on Gonyea did not otherwise specify the content to which the federal government objects.

**DHS issues a public statement five months later stating it is still conducting an "ongoing investigation" into Streever's three-paragraph email.**

104.    On June 28, 2026, a DHS spokesperson—asked about the "WARNING NOTICE" directed to Plaintiff Streever—told journalists that "ICE investigates all credible threats towards

16

its employees and officers, including threats to the ICE Director. As a matter of policy, we do not comment on any ongoing investigations."

105.    This statement to journalists followed hard in the wake of Gonyea providing a copy of her "WARNING NOTICE" and other information about the agents' confrontation to several media outlets, including Syracuse.com and National Public Radio.

106.    It echoed a June 27, 2026, post to DHS's official X account (@DHSgov) with a screenshot of the NPR story and a comment on the investigation that stated in part:

> This individual didn't just post "about ICE" — she committed a FEDERAL CRIME by posting the address of an ICE law enforcement officer online.
>
> Doxxing federal law enforcement officers is a federal crime that puts their lives and their families in serious danger. . . .
>
> If you doxx our officers, you will face the consequences.

**As intended, Defendants' "WARNING NOTICE" program has harmed and will continue to irreparably harm Streever.**

107.    Plaintiff Streever has suffered irreparable harm because of Defendants' conduct, including their application of the "WARNING NOTICE" to his protected speech.[8]

108.    Streever desires to continue engaging in the type of criticism of ICE, DHS, and Trump administration officials that caused Defendants to issue the "WARNING NOTICE" document.

109.    However, because of Defendants' conduct—including issuance of the "WARNING NOTICE" to Streever—he is uncertain and wary of what he is able to say about his views on the

---

[8] In the context of enforcing regulations pertaining to employers' verification of employee eligibility, ICE issues (or has previously issued) ICE Form I-846. A version of that form is available at    https://www.aila.org/files/o-files/view-file/3B4DB6C7-E3FB-4170-B6A1-639E9E39D45F. That form, adopted through a regulatory process affording a notice-and-comment period, requires specification of the alleged violation and is signed only by the agents (not the recipient).

morality of the federal government's activities in enforcing immigration law, one of the defining political and social issues driving discourse in the United States.

110. Because of Defendants' conduct, Streever has self-censored some speech on social media, including to friends and others online, out of concern that a remark may be misconstrued or trigger continued harassment by federal agents.

111. Defendants' "WARNING NOTICE" document warns that if Streever continues to engage in protected expression like his email to Lyons, Defendants will continue their efforts to intimidate and coerce Streever into self-censorship under baseless threats of criminal sanctions.

112. Defendants' public statements in response to publication of the "WARNING NOTICE" documents—five months after Streever sent his email to Lyons—reinforce that they intend to continue their scheme of coercing and chilling Streever (and others) into self-censorship under baseless threats of criminal sanctions.

113. Streever fears, as any objectively reasonable person would, that if he continues to engage in expression sharing his views about and to government officials, he will be subject to further coercive activity and retaliatory acts, including through issuance of further "WARNING NOTICE" demands, surveillance, unwelcome visits from federal police, and continued threat of arrest and/or prosecution.

**FIRST CAUSE OF ACTION**
**First Amendment Violation**
**(Rights to Free Speech and to Petition)**

114. Plaintiff Streever re-alleges and re-incorporates paragraphs 1–113 as though fully set forth herein.

115. Streever's email to Acting Director Lyons is speech protected under the Speech and Petition Clauses of the First Amendment.

116.    Streever's email is core political speech—criticizing a government official and government policy—that sits at the highest rung of First Amendment protection. *E.g.*, *Bridges v. California*, 314 U.S. 252, 270–71 (1941); *Stromberg v. California*, 283 U.S. 359, 369 (1931).

117.    Under the First Amendment, speech is protected unless it falls into an unprotected category, such as true threats. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010); *see also Counterman v. Colorado*, 600 U.S. 66, 72 (2023).

118.    Streever's speech does not fall into one of those categories of unprotected speech.

119.    Streever's email was not a "true threat" unprotected by the First Amendment.

120.    The context of Streever's email, at the height of a public debate about a key administration policy, makes clear it cannot constitute a true threat, given the "often vituperative" tenor of political debate. *See Watts v. U. S.*, 394 U.S. 705, 708 (1969); *see also Hill*, 482 U.S. at 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

121.    Defendants' five-month delay in acting in response to Streever's email undermines any claim that Defendants interpreted the email as a credible threat.

122.    An objectively reasonable person would not understand Streever's email as a serious expression of an intent to commit an act of unlawful violence, nor did Streever consciously disregard a substantial risk that his email would be viewed as a threat of violence or intend that his email would be viewed as a threat of violence.

123.    Because the First Amendment protects Streever's speech, Defendants have no basis to claim his speech violates any federal law, let alone the federal statutes recited in the warning notice.

124. For the same reason, Defendants lack any lawful basis to order Streever to cease his protected speech on matters of public concern; sign the "WARNING NOTICE" they served on Streever; or otherwise take any action to coerce Streever into silence or refraining from speaking out on matters of public concern or petitioning the government.

125. Instead, Defendants are subjecting Streever to a systemic campaign to silence and chill protected speech through coercion, which violates the First Amendment.

126. In "requesting that [Streever] promptly remove and/or discontinue" the "behavior" of sending emails to law enforcement under threat of criminal penalties (citing statutes "OPR is responsible for enforcing"), the "WARNING NOTICE" purports to prohibit future expression, imposing an unconstitutional prior restraint on speech. *E.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

127. A public official who tries to silence the 'expression of ideas and opinions through 'actual or threatened imposition of government power or sanction'" violates the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

128. For example and without limitation, by (a) going to Streever's home to serve him with the "WARNING NOTICE," (b) demanding Streever cease his protected speech under a baseless threat of prosecution and without any legitimate law enforcement purpose, (c) stating that he must sign the "WARNING NOTICE," (d) tracking Streever down to his home and his hotel to pursue those same ends, and (e) issuing a public statement asserting they are continuing to investigate Streever's protected speech, Defendants are violating the First Amendment's bar against the government making threats to coerce a speaker to stop exercising their First Amendment rights.

20

129. An actual and present controversy exists between Streever and Defendants because Defendants maintain that Streever's expression is unlawful and/or that he may be lawfully sanctioned for similar future speech.

130. A declaration that Streever's speech is protected by the First Amendment will determine the parties' legal rights and obligations and resolve the dispute.

131. Unless enjoined, Defendants will continue to threaten and chill Streever's protected expression.

132. Streever has suffered, is suffering, and will continue to suffer irreparable harm to his First Amendment rights because of Defendants' conduct, which only injunctive relief can remedy.

133. Legal remedies are inadequate because (a) the "loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable injury, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted); (b) Streever has no other sufficient remedy to redress Defendants' coercion; and (c) monetary damages cannot be obtained against Defendants by virtue of their sovereign immunity.

134. The harm to Streever's core First Amendment rights that would flow from the denial of injunctive relief outweighs any burden on Defendants from being required to comply with the First Amendment.

135. Injunctive relief serves the public interest by limiting the chilling effect Defendants' unconstitutional campaign of coercion will create on the public's rights to speech and to petition.

**<u>SECOND CAUSE OF ACTION</u>**
**First Amendment Violation**
**(Retaliation)**

136. Streever re-alleges and re-incorporates paragraphs 1–113 and 115–128 as though fully set forth herein.

21

137.    The First Amendment "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)).

138.    A government official engages in unconstitutional retaliation when he (1) targets activity protected by the First Amendment; (2) takes action that is sufficient to deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's adverse action. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

139.    Defendants' actions targeting Plaintiff Streever meet each of the requirements to constitute unconstitutional retaliation.

140.    Defendants' "WARNING NOTICE" document recites Streever's expressive activity.

141.    As described *supra* at ¶¶ 115–122, Streever's expression is protected by the First Amendment.

142.    Defendants' actions that would, individually or cumulatively, be sufficient to deter a person of ordinary firmness from speaking again include:

      (a)    Serving a "WARNING NOTICE" document (i) falsely declaring that Streever's protected expression violates federal law and threatening prosecution; (ii) requiring Streever to cease that protected expression under those false pretenses; and (iii) insisting Streever sign and return the warning to federal agents;

      (b)    Dispatching federal agents to Streever's home and tracking him to a hotel in another city in response to his protected expression; and

      (c)    Issuing public statements declaring that Streever's expression constitutes a federal offense or is the subject of an "ongoing" investigation.

22

143.    There is a causal nexus between Streever's expression and Defendants' retaliatory conduct.

144.    An actual and present controversy exists between Streever and Defendants because Defendants maintain that Streever's expression is unlawful and that they may constitutionally restrain his similar future expression.

145.    A declaration that Streever's speech is protected by the First Amendment will determine the parties' legal rights and obligations and resolve the dispute.

146.    Unless enjoined, Defendants will continue to retaliate against Streever due to his protected expression.

147.    Streever has suffered, is suffering, and will continue to suffer irreparable harm to his First Amendment rights because of Defendants' conduct, that only injunctive relief can remedy.

148.    Legal remedies are inadequate because (a) the "loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable injury, *Roman Cath. Diocese*, 592 at 19 (citation omitted); (b) Streever has no other sufficient remedy to redress Defendants' coercion; and (c) monetary damages cannot be obtained against Defendants by virtue of their sovereign immunity.

149.    The harm to Streever's core First Amendment rights that would flow from the denial of injunctive relief outweighs any burden on Defendants from being required to comply with the First Amendment.

150.    Injunctive relief serves the public interest by limiting the chilling effect Defendants' unconstitutional retaliation will create on the public's rights to speech and to petition occasioned by Defendants' retaliatory campaign.

23

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Streever respectfully requests the following relief:

A.    Declare Streever's speech is protected by the Speech Clause of the First Amendment.

B.    Declare Streever's speech is also protected by the Petition Clause of the First Amendment.

C.    Declare Defendants' issuance of "WARNING NOTICE" documents is sufficient to chill a person of ordinary firmness from engaging in expression protected by the First Amendment.

D.    Declare Defendants' acts of coercion and retaliation, as described in this Complaint, violate Streever's First Amendment rights.

E.    Preliminarily[9] and permanently enjoin Defendants, their officers, agents, servants, and employees, and any persons or entities acting in concert with Defendants, from taking any further actions, formal or informal, to coerce, threaten, retaliate against, or intimate repercussions directly or indirectly to Plaintiff Streever for his protected speech and petitioning activity (including without limitation the speech and petitioning activity in his January 26, 2026 email) in violation of his constitutional rights.

F.    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees, and any persons or entities acting in concert with Defendants, from taking any further steps in reliance on Streever's receipt of the "WARNING NOTICE.".

G.    Award Streever the costs incurred in bringing this action.

---

[9] As required by Local Civil Rule 65.1(c), Plaintiff Streever will apply for a preliminary injunction by a document separate from this Complaint.

H.      Award Streever the fees and other expenses incurred in bringing this action, as provided by 28 U.S.C. § 2412(d).

I.      Grant Streever any and all other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

In compliance with Federal Rule of Civil Procedure 38, Plaintiff Streever demands a trial by jury on all issues so triable.

Dated: July 6, 2026

Respectfully Submitted,

/s/ JT Morris
JT Morris, Bar No. 979772
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
jt.morris@fire.org

Adam Steinbaugh, Penn. Bar No. 326475*
Jeffrey Zeman, Penn. Bar No. 328570*
Hannah Abbott, Penn. Bar No. 337123*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION (FIRE)
510 Walnut St., Ste. 900
Philadelphia, Penn. 19106
(215) 717-3473
adam@fire.org
jeff.zeman@fire.org
hannah.abbott@fire.org

* *Pro hac vice* application forthcoming.

*Counsel for Plaintiff*

25

## VERIFICATION OF DAVID STREEVER

Pursuant to 28 U.S.C. § 1746, I, DAVID STREEVER, declare as follows:

1.      I am a Plaintiff in the present case and a citizen of the United States of America.

2.      I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3.      I have personal knowledge of the factual allegations in paragraphs 5, 20–23, 68–73, 80, 89–93, 95–98, 107–111, 113, 122 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 5, 2026.

David Streever
David Streever

26