**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAVID STREEVER,<br><br><br>                          *Plaintiff*,<br>     v.<br><br>MARKWAYNE MULLIN, in his official<br>capacity as Secretary of the Department of<br>Homeland Security, et al.,<br><br>                         *Defendants*. | Civil Action No.: 1:26-cv-02356-RC |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION .......................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    DHS sparks national outrage after its agents kill two Americans in Minnesota..............................................................................................................2

    Streever emails ICE's Acting Director, criticizing his agency's defense of agents who shot Alex Pretti.......................................................................................4

    Five months after Streever wrote Director Lyons, two ICE agents confront Streever's wife to issue Streever a "WARNING NOTICE" about his email. .........................................................................................................................5

    DHS agents continue to hunt for Streever over his email, tracking Streever and his seven-year-old daughter to a New York City hotel. .................................7

    Streever is just one of many Americans DHS is targeting for criticizing ICE online. ..............................................................................................................8

    After news breaks of Streever's plight, DHS announces it will persist targeting Streever over his speech. .....................................................................10

ARGUMENT................................................................................................................11

    I.    Plaintiff Is Likely to Prevail on the Merits of His First Amendment Claims. ................................................................................................................12

        A.    Streever's email is political expression at the First Amendment's zenith. .......................................................................12

            1.    An email to a senior official about contested policies is political speech receiving the most robust First Amendment protection.................................................13

            2.    The Petition Clause also protects Streever's email.........................15

            3.    Defendants cannot meet their heavy burden to show the First Amendment does not protect Streever's solitary email.................................................................................16

    B.    Streever is likely to succeed on his first cause of action because Defendants' coercion tactics violate the First Amendment. ..................................................................................21

        1.    The First Amendment prohibits government officials from using the coercive power of the state, in all forms, to silence speakers. ...............................................21

        2.    Defendants are violating the First Amendment by trying to coerce Streever into silence. ............................................23

    C.    Streever is likely to succeed on his retaliation cause of action because Defendants' conduct would chill a reasonable person from speaking. ..................................................................26

II.    Plaintiff Will Suffer Irreparable Harm Absent an Injunction. ................................29

III.    The Public Interest and Balance of Equities Overwhelmingly Favor an Injunction. ...........................................................................................31

IV.    The Court Should Not Require Streever to Post a Bond for a Preliminary Injunction. ....................................................................32

CONCLUSION..................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)..................................................................................................... 21

*\*Accountability NOW USA v. Griess*,
No. 26-1385 (RDM), 2026 WL 1870626 (D.D.C. June 29, 2026)................. 17, 18, 19, 20

*ACLU of Ky. v. McCreary Cnty.*,
354 F.3d 438 (6th Cir. 2003) ........................................................................................ 19

*ACLU v. City of Pittsburgh*,
586 F. Supp. 417 (W.D. Pa. 1984).................................................................................. 22

*Am. Family Ass'n, Inc. v. City & County of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ....................................................................................... 22

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ................................................................................. 11, 29

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ...................................................................................... 26

*Assoc. Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) ................................................................................. 32

*\*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ................................................................................... passim

*\*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)................................................................................................... passim

*Baumgartner v. United States*,
322 U.S. 665 (1944).................................................................................................... 15

*Bennett v. Hendrix*,
423 F.3d 1247 (11th Cir. 2005) .................................................................................... 27

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011).................................................................................................... 15

*Bridges v. California*,
314 U.S. 252 (1941)......................................................................................... 13, 15, 32

*Buckley v. Am. Const. Law Found., Inc.*,
525 U.S. 182 (1999).................................................................................................... 13

iii

*City of Houston v. Hill*,
    482 U.S. 451 (1987)......................................................................................... 1, 15

*Cohen v. California*,
    403 U.S. 15 (1971)............................................................................................. 14

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ........................................................................... 27

*Counterman v. Colorado*,
    600 U.S. 66 (2023)................................................................................... 16, 17, 19

*Endocrine Soc'y v. Fed. Trade Comm'n*,
    No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026)................................. 32

*Fairley v. Andrews*,
    578 F.3d 518 (7th Cir. 2009) ........................................................................... 26

*Givhan v. W. Line Consol. Sch. Dist.*,
    439 U.S. 410 (1979)......................................................................................... 15

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ......................................................................... 31

*Guffey v. Mauskopf*,
    45 F.4th 442 (D.C. Cir. 2022) ..................................................................... 13, 31

*Hartley v. Wilfert*,
    918 F. Supp. 2d 45 (D.D.C. 2013) .............................................................. 27, 28

*Hartman v. Moore*,
    547 U.S. 250 (2006)......................................................................................... 26

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ......................................................................... 31

*Jenner & Block LLP v. U.S. Dep't of Just.*,
    784 F. Supp. 3d 76 (D.D.C. 2025) ............................................................... 22, 27

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ......................................................................... 12

*Los Angeles Press Club v. Noem*,
    171 F.4th 1179 (9th Cir. 2026) ...................................................................... 9, 31

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018)........................................................................................... 32

*McDonald v. Smith*,
   472 U.S. 479 (1985)...................................................................................... 15

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025)........................................................... 27, 31, 32

*Mink v. Knox,*
   613 F.3d 995 (10th Cir. 2010) ....................................................................... 16

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964)..................................................................... 1, 13, 15, 32

*NAACP v. Button*,
   371 U.S. 415 (1963)................................................................................ 13, 17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)............................................................................ 21, 22, 23

*Neb. Press Ass'n v. Stuart*,
   427 U.S. 539 (1976)...................................................................................... 26

*Nken v. Holder*,
   556 U.S. 418 (2009)...................................................................................... 12

*Okwedy v. Molinari*,
   333 F.3d 339 (2d Cir. 2003)..................................................................... 21, 24

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   783 F. Supp. 3d 105 (D.D.C. 2025).............................................................. 22

*Playboy Enterprises, Inc. v. Meese*,
   639 F. Supp. 581 (D.D.C. 1986).............................................................. 22, 30

*Rankin v. McPherson*,
   483 U.S. 378 (1987)...................................................................................... 20

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020)........................................................................................ 29

*Tincher v. Noem*,
   816 F. Supp. 3d 931 (D. Minn. 2026).......................................................... 9, 31

*Toolasprashad v. Bureau of Prisons*,
   286 F.3d 576 (D.C. Cir. 2002) ...................................................................... 26

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020) ......................................................... 29, 31

v

*United States v. Jubert*,
    139 F.4th 484 (5th Cir. 2025) ...................................................................................... 17

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ..................................................................................................... 16

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................................................................... 16

*United States v. Syring*,
    522 F. Supp. 2d 125 (D.D.C. 2007) ............................................................................. 17

*Virginia v. Black*,
    538 U.S. 343 (2003) ..................................................................................................... 19

*WallBuilder Presentations v. Clarke*,
    No. CV 23-3695 (BAH), 2024 WL 2299581 (D.D.C. May 21, 2024) ............................ 29

*\*Watts v. United States*,
    394 U.S. 705 (1969) ......................................................................................... 17, 18, 20

*Wayte v. United States*,
    470 U.S. 598 (1985) ..................................................................................................... 16

*We the People Found., Inc. v. United States*,
    485 F.3d 140 (D.C. Cir. 2007) ..................................................................................... 16

*Whitney v. California*,
    274 U.S. 357 (1927) ..................................................................................................... 21

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025) ............................................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................................... 11

**<u>Statutes</u>**

18 U.S.C.
    § 115(a) ........................................................................................................................ 32

18 U.S.C.
    § 119............................................................................................................................. 32

**<u>Other Authorities</u>**

Andrew Glass,
    *Sen. Joe McCarthy Assailed by Army Counsel, June 9, 1954*, Politico (June 9,
    2017, 12:30 AM)........................................................................................................... 15

Caitlin Yilek,
    *Tillis Becomes First GOP Senator to Call for "Incompetent" Noem to Step Down*,
    CBS News (Jan. 27, 2026, 7:36 PM) ................................................................ 5

Chandelis Duster & Sergio Martínez-Beltrán,
    Nationwide Anti-ICE Protests Call for Accountability After Renee Good's Death,
    NPR (Jan. 10, 2026, updated Jan. 11, 2026) .......................................................... 4

Decl. of Movant Jon Doe in Supp. of Mot. to Quash Admin. Subpoena, *Doe v. U.S. Dep't*
    *of Homeland Sec.*,
    No. 5:26-mc-80026 (N.D. Cal. Feb. 2, 2026), ECF No. 1-7 ........................................... 10

Devon Lum, Haley Willis, Alexander Cardia, Dmitriy Khavin & Ainara Tiefenthäler,
    *New Video Analysis Reveals Flawed and Fatal Decisions in Shooting of Pretti*,
    N.Y. Times (Jan. 27, 2026) ........................................................................... 5

Devon Lum, Robin Stein & Ainara Tiefenthäler,
    *Videos Contradict Trump Administration Account of ICE Shooting in*
    *Minneapolis*, N.Y. Times (Jan. 8, 2026) .............................................................. 4

Frederick Douglass,
    "Is it Right and Wise to Kill a Kidnapper" (June 2, 1854) ............................................. 21

Homeland Security (@DHSgov), X (July 6, 2026, 3:06 PM) ......................................................... 11

Homeland Security (@DHSgov), X (June 27, 2026, 1:36 PM) ....................................................... 11

House Committee on Homeland Security,
    Oversight of the Dep't of Homeland Security: ICE, CBP, and USCIS, YouTube
    (Feb. 10, 2026) ...................................................................................... 16

James H. Hutson,
    *Religion and the Foundation of the American Republic* (1998) ........................................ 21

John Woodrow Cox,
    *Trump Administration Makes Misleading Case in High-Stakes Asylum hearing*,
    Wash. Post (Oct. 30, 2025) ........................................................................... 10

Josh Campbell,
    *The Trump Administration's Rushed Narrative About the Killing of Alex Pretti*
    *Has Collapsed*, CNN (Feb. 2, 2026, 2:43 PM) ....................................................... 5

Jude Joffe-Block,
    *He Sent a Harsh Email to ICE's Top Official. 5 Months Later, Federal Agents*
    *Tracked Him Down*, NPR (July 1, 2026, 5:00 AM) .................................................. 11

Kyle Stokes,
*Survey: Operation Metro Surge Agents Frequently Used Force, Random Stops*,
Axios Twin Cities (Mar. 27, 2026)........................................................................... 3

Letter from Thomas Jefferson to William Stephens Smith (Nov. 13, 1787), Library of
Congress..................................................................................................... 21

Matt Dixon & Peter Nicholas,
*Trump Reshuffles His Minnesota Operation After Backlash from Second Fatal
Shooting*, NBC News (Jan. 27, 2026, 6:51 PM) ................................................... 6

Meredith Deliso,
*Anti-ICE Protests Take Place Nationwide Following Fatal Shootings in
Minneapolis*, ABC News (Jan. 30, 2026, 6:05 PM) ............................................. 5

Motion to Quash Subpoena, *Doe v. U.S. Dep't of Homeland Sec.*,
No. 3:25-mc-80286 (N.D. Cal. Sept. 18, 2025), ECF No. 1............................................ 10

Notice of Vol. Dismissal, *Doe v. U.S. Dep't of Homeland Sec.*,
No. 5:26-mc-80026 (N.D. Cal. Feb. 10, 2026), ECF No. 8............................................. 10

PBS NewsHour,
*WATCH: Noem Defends Fatal ICE Shooting of Minneapolis Woman in Remarks
to Reporters*, PBS (Jan. 7, 2026, 7:00 PM)............................................................ 4

Press Release,
*New Milestone in Operation Metro Surge: 4,000+ Criminal Illegals Removed
from Minnesota Streets*, White House (Feb. 4, 2026).......................................... 3

Rebecca Santana & Mike Balsamo,
*Homeland Security Plans 2,000 Officers in Minnesota for Its "Largest
Immigration Operation Ever,"* Associated Press (Jan. 6, 2026) ........................................ 3

Richard Salgado,
*Skirting Judicial Scrutiny by Mooting and Scooting*, Lawfare (Feb. 26, 2025, 2:00
PM) ...................................................................................................... 10

Robin Stein, et al.,
*Video Analysis of ICE Shooting Sheds Light on Contested Moments*, N.Y. Times
(Jan. 15, 2026).......................................................................................... 4

## **Regulations**

Privacy Act of 1974, 5 U.S.C. § 552a; System of Records,
90 Fed. Reg. 34,282–34,285 (July 21, 2025)............................................................ 8, 37

**INTRODUCTION**

David Streever exercised his constitutional rights to free speech and to petition the government for a redress of grievances by emailing former Acting Director of Immigration and Customs Enforcement (ICE), Todd Lyons. In three short paragraphs, Streever denounced the director's defense of ICE agents who shot and killed Alex Pretti in Minneapolis. Five months later, the Department of Homeland Security (DHS) dispatched federal agents to Streever's home and left with his wife a formal "WARNING NOTICE" declaring he "MAY BE IN VIOLATION OF FEDERAL LAW," demanding he "remove and/or discontinue" his protected speech, and warning of "federal and state prosecution." Were that not alarming enough, two days later, federal agents tracked Streever and his seven-year-old daughter to a New York City hotel, where Streever was awoken by a call from the clerk telling him a federal agent was looking for him. Those acts prompted this lawsuit against DHS, its ICE component, and their leaders and agents.

Defendants are trampling the First Amendment's "profound national commitment" to "uninhibited" debate on public affairs, including "vehement, caustic, and sometimes unpleasantly sharp" criticisms of public officials, necessary to protect our "wide-open" society. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Our Constitution does not permit federal (or any) law-enforcement officials to answer an email criticizing their leadership with coercive tactics, let alone the threatening "warning" here. Rather, the right to criticize law enforcement without "risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987).

Defendants' conduct, intended to intimidate Streever into holding his tongue, threatens our free nation and violates its commitments to free expression and the people's right to hold public servants accountable. But the First Amendment stands resolutely in the way. Streever's speech sits atop a twin pinnacle of First Amendment protection: the freedom to criticize the government and

1

the freedom to petition it. Under our Constitution, Defendants cannot deploy state power to coerce Streever's silence. Nor can they retaliate against him for criticizing the director of one of the country's most controversial law enforcement agencies.

Rather than abandoning their speech-chilling campaign, Defendants have pledged to persist in it, announcing to the American public that they are continuing—five months after Streever condemned Lyons—to investigate a three-paragraph email. Try as they may, Defendants cannot recast Streever's protected criticism as any crime, let alone a "true threat" of violence. No serious person could find a hint of threatened violence in Streever's email.

If Defendants had their way, every American who takes to a sidewalk, city council podium, or the internet to rebuke those who serve them would be fair game for bogus yet speech-chilling "WARNING NOTICES," personally delivered by police or federal agents at the speaker's doorstep. That's a page right out of the authoritarian's playbook—and has no place in our constitutional order.

Our courts are the last line of defense against the abuse of power now chilling Streever's protected speech, and that of others who Defendants intend to silence through their retaliatory campaign. This Court should thwart that chill and uphold the First Amendment by promptly enjoining Defendants' ongoing efforts to intimidate Streever into silence.

## STATEMENT OF FACTS

**DHS sparks national outrage after its agents kill two Americans in Minnesota.**

In December 2025, the Trump administration launched "Operation Metro Surge," deploying over 2,000 federal agents to Minnesota.[1] Calling it "the largest DHS operation ever,"

---

[1] Rebecca Santana & Mike Balsamo, *Homeland Security Plans 2,000 Officers in Minnesota for Its "Largest Immigration Operation Ever,"* Associated Press (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817 [perma.cc/9WGL-SQHL]; *see also* Press Release, *New*

DHS dispatched agents from ICE, Customs and Border Patrol, and Homeland Security Investigations to the Minneapolis area.[2] Operation Metro Surge impacted the Twin Cities—with nearly a third of the residents reportedly having at least one interaction with federal agents during the surge[3]—and ignited outrage across the country after federal agents fatally shot two Minneapolis residents opposed to ICE's conduct.

On January 7, 2026, ICE agent Jonathan Ross shot Renée Good in Minneapolis. Widely circulated videos show Ross firing three shots and calling Good a "fucking bitch."[4] While Homeland Security Secretary Kristi Noem claimed Good had committed an "act of domestic terrorism,"[5] over a thousand protests across the United States followed,[6] with many Americans asking whether video evidence disproved DHS's claims.[7]

---

*Milestone in Operation Metro Surge: 4,000+ Criminal Illegals Removed from Minnesota Streets*, White House (Feb. 4, 2026), https://www.whitehouse.gov/releases/2026/02/new-milestone-in-operation-metro-surge-4000-criminal-illegals-removed-from-minnesota-streets [perma.cc/HRB6-6ECK].

[2] Santana, *supra* n.1.

[3] Kyle Stokes, *Survey: Operation Metro Surge Agents Frequently Used Force, Random Stops*, Axios Twin Cities (Mar. 27, 2026), https://www.axios.com/local/twin-cities/2026/03/27/ice-metro-surge-random-stop-survey.

[4] Robin Stein, et al., *Video Analysis of ICE Shooting Sheds Light on Contested Moments*, N.Y. Times (Jan. 15, 2026), https://www.nytimes.com/video/us/100000010648638/ice-shooting-renee-good-minneapolis-videos-analysis.html. The remark is at 6:29.

[5] PBS NewsHour, *WATCH: Noem Defends Fatal ICE Shooting of Minneapolis Woman in Remarks to Reporters*, PBS (Jan. 7, 2026, 7:00 PM), https://www.pbs.org/newshour/politics/watch-live-noem-holds-news-conference-in-minneapolis-after-fatal-ice-shooting-of-woman [perma.cc/BLG9-NQ7W].

[6] Chandelis Duster & Sergio Martínez-Beltrán, *Nationwide Anti-ICE Protests Call for Accountability After Renee Good's Death*, NPR (Jan. 10, 2026, updated Jan. 11, 2026), https://www.npr.org/2026/01/10/nx-s1-5673229/ice-protests-minneapolis-portland-renee-good. [https://perma.cc/C4ZS-RXZ8]

[7] Devon Lum, Robin Stein & Ainara Tiefenthäler, *Videos Contradict Trump Administration Account of ICE Shooting in Minneapolis*, N.Y. Times (Jan. 8, 2026), https://www.nytimes.com/video/us/10000010631041/minneapolis-ice-shooting-video.html.

Two weeks later in Minneapolis, federal agents shot and killed Alex Pretti. Video shows agents restraining Pretti, removing a handgun from his person, then holding him on the ground and firing ten shots, including into Pretti's back.[8] While DHS officials initially branded Pretti a "domestic terrorist" who sought to "massacre law enforcement," video showed Pretti never drew a weapon.[9] The shooting dominated public debate and renewed protests nationwide.[10] In the shooting's wake, multiple legislative officials called for Noem's resignation, including Senators Thom Tillis (who branded Noem "incompetent") and Lisa Murkowski.[11] The fallout reportedly led President Trump to remove Border Patrol Commander Gregory Bovino from Minnesota, winding down Operation Metro Surge.[12]

**Streever emails ICE's Acting Director, criticizing his agency's defense of agents who shot Alex Pretti.**

David Streever was—and is—one of the countless Americans upset by their government's conduct in Minneapolis. Verified Compl. ¶¶ 49–50, 55, 68–70, Ex. 1. The Rochester, New York

---

[8] Devon Lum, Haley Willis, Alexander Cardia, Dmitriy Khavin & Ainara Tiefenthäler, *New Video Analysis Reveals Flawed and Fatal Decisions in Shooting of Pretti*, N.Y. Times (Jan. 27, 2026), https://www.nytimes.com/video/us/100000010668660/new-video-analysis-reveals-flawed-and-fatal-decisions-in-shooting-of-pretti.html.

[9] Josh Campbell, *The Trump Administration's Rushed Narrative About the Killing of Alex Pretti Has Collapsed*, CNN (Feb. 2, 2026, 2:43 PM), https://www.cnn.com/2026/02/02/us/alex-pretti-shooting-trump-administration-narrative [archive.is/AZJNF].

[10] Meredith Deliso, *Anti-ICE Protests Take Place Nationwide Following Fatal Shootings in Minneapolis*, ABC News (Jan. 30, 2026, 6:05 PM), https://abcnews.com/US/anti-ice-protests-place-nationwide-fatal-shootings-minneapolis/story?id=129670048 [perma.cc/8A5R-UKAE].

[11] Caitlin Yilek, *Tillis Becomes First GOP Senator to Call for "Incompetent" Noem to Step Down*, CBS News (Jan. 27, 2026, 7:36 PM), https://www.cbsnews.com/news/tillis-murkowski-kristi-noem-step-down-dhs [perma.cc/Q3W8-CQ8L].

[12] Matt Dixon & Peter Nicholas, *Trump Reshuffles His Minnesota Operation After Backlash from Second Fatal Shooting*, NBC News (Jan. 27, 2026, 6:51 PM), https://www.nbcnews.com/politics/donald-trump/trump-reshuffles-minnesota-operation-backlash-second-fatal-shooting-rcna255984 [perma.cc/X7JJ-3EUS].

4

resident is a former journalist and father of two, with his eldest daughter just seven years old. *Id.* ¶¶ 20–21. Streever and his wife, a priest in The Episcopal Church, have a strong sense of morality and of conscience. *See id.* ¶ 22.

So on January 26, 2026, in the thick of the national debate over Minneapolis and Alex Pretti's violent end, Streever decided to exercise a freedom deeply rooted in our nation's traditions: writing to the officials he viewed as responsible and appealing to their conscience. *Id.* ¶ 68–70, Ex. 1. With Google's assistance, Streever found the government email address for the then-Acting Director of ICE, Todd M. Lyons. *See id.* ¶ 68.

Using Streever's real name and photograph, Streever sent Director Lyons an email rebuking him for ICE's conduct, comparing him to a Nazi official, and pleading with him to listen to his conscience before it was too late. *Id.* ¶¶ 69–70, Ex. 1. The three-paragraph email read in full:

> You are a monstrous human being and will go down in history as America's Reinhard Heydrich, the butcher.
>
> The way you are protecting the obvious execution in Minnesota, even as we see the videos, will lead to your downfall. Even Trump will turn on you before the end, and you will be a sad, despised man who eats himself alive with shame at your own pathetic weakness.
>
> You will never know peace. You will seek to lose yourself, to escape the burden of knowing the truth about yourself. But wherever you go, you will find yourself. You will torment yourself until your last day on Earth.

*Id.* ¶ 70, Ex. 1.

Nearly half a year later, DHS responded.

**Five months after Streever wrote Director Lyons, two ICE agents confront Streever's wife to issue Streever a "WARNING NOTICE" about his email.**

On June 23, 2026, the Rev. Hilary Streever came home, still wearing her clerical collar, to discover Defendants ICE Special Agents Brodie and Abbi Henry at the Streevers' Rochester home.

5

Decl. Rev. Streever ¶ 5. One of the agents told the Rev. Streever they were looking for her husband because he "may or may not have" threatened a federal agent. *Id.* ¶ 8. When a skeptical the Rev. Streever told them her husband would not have done that, and that he was traveling in Europe, the agents handed her a document to give to Streever. *Id.* ¶¶ 9–11; Verified Compl. ¶ 80, Ex. 2. It bore a bolded title: "**WARNING NOTICE**." *Id.* ¶ 11; Verified Compl. ¶ 80, Ex. 2.

The Notice is verbose yet short on details. It says ICE's Office of Professional Responsibility (OPR) "is responsible for" protecting against "internal and external threats" to ICE by "enforcing crimes against the United States," such as "threats made against ICE personnel." Verified Compl. ¶ 80, Ex. 2. To those ends, the Notice vaguely asserts that "OPR has identified an email sent to Acting Director Todd Lyons, which it has reason to believe may constitute a violation of Title 18 of the U.S. Code." *Id.* The Notice does not identify the content of the email or hint at the "reason" federal agents believed the email violated any law. *See id.* Nor does it specify which of the 2,725 sections of Title 18 that Defendants believe applies.[13] *Id.*

Even so, the "WARNING NOTICE" declares, with emphasis in the original: "**YOU MAY BE IN VIOLATION OF FEDERAL LAW**." *Id.* The Notice then requests Streever "promptly remove and/or discontinue the aforementioned behavior," *id.*—that is, his critical email sent to a high-ranking law enforcement official.

It then, with emphasis (again) in the original, threatens Streever with criminal prosecution should he fail to comply:

> ***This Notice officially informs you that it is unlawful to threaten to assault, kidnap, and/or murder a federal official […] with the intent to impede, intimidate, and/or interfere with the federal official's duties or retaliate against a federal official due to the performance of their duties. 18 U.S.C. § 115(a). […] Violations of***

---

[13] This assumes the "NOTICE" refers to Part I ("Crimes") of Title 18, not any of that Title's other four Parts.

6

> *these or related laws could subject you to both federal and state prosecution.*

*Id.* Then the Notice, in a section titled "Acknowledgment of Recipient," calls for Streever to sign it, ominously warning that OPR will "take[] into consideration" the "[r]eceipt of this Notice … *should you continue* to be involved in any criminal activities described above." Verified Compl. ¶¶ 85–86, Ex. 2 (emphasis added).[14]

**DHS agents continue to hunt for Streever over his email, tracking Streever and his seven-year-old daughter to a New York City hotel.**

After the Rev. Streever told the agents, when they said they were looking for her husband, that he would return to Rochester from Europe on Friday, June 26, Decl. Rev. Streever ¶¶ 6–7, DHS agents did not await his return. Instead, DHS attempted to confront him a day earlier, on Thursday. DHS tracked Streever and his daughter to the New York City hotel where they were staying before resuming their return journey to Rochester. That night, a hotel clerk woke Streever to tell him a DHS agent had appeared, asking about him and leaving a business card. Verified Compl. ¶¶ 90–93. Streever also received several voicemails that night from unnamed callers identifying themselves only as "Homeland Security Investigations." *Id.* ¶ 95.

The experience understandably unnerved Streever and his family. *Id.* ¶ 96; Decl. Rev. Streever ¶ 15. His wife had not told the agents the hotel's name or location. Decl. Rev. Streever ¶ 14; *see* Verified Compl. ¶¶ 94. Yet federal agents knew where to find him.

---

[14] The Notice also does not alert the recipient that ICE maintains an "ICE Intelligence Records Systems (IIRS)" database containing "published information on individuals and events of interest to ICE, including social media account information and social media posts" and "geolocation information" of persons ICE has unilaterally deemed—as the Notice declares about Streever's email—to "have made credible threats against ICE personnel." Privacy Act of 1974, 5 U.S.C. § 552a; System of Records, 90 Fed. Reg. 34,282–34,285 (July 21, 2025).

While Streever was anxious, his daughter was terrified. Concerned the agents would again attempt to confront him—or worse—on the Amtrak to Rochester, Streever tried to prepare his daughter to be brave. Verified Compl. ¶ 97. But what had been a happy father-daughter trip to a theme park in Finland ended in tears, as his daughter pled, "I don't want them to kill you." *Id.* ¶ 98.

**Streever is just one of many Americans DHS is targeting for criticizing ICE online.**

In recent months, DHS and ICE (including its Office of Professional Responsibility) have undertaken efforts to identify and intimidate internet users, demonstrators, and journalists because of their protected speech. For example, after an October 2025 *Washington Post* article documented an ICE attorney's "misleading" claims in "ask[ing] a judge … to deport a father of two to Afghanistan, where he expects the Taliban to kill him,"[15] a reader emailed the attorney at his DHS email address to appeal to the attorney's conscience, urging him to spare the father's life.[16] Five hours later, Google alerted the reader it had received an "Immigration Enforcement Subpoena" from DHS for his account information.[17] In short order, two DHS agents and a uniformed police officer showed up at the man's home and interrogated him about his message.[18] When the reader moved to quash the subpoena, DHS quickly withdrew it and mooted the case—a common practice to frustrate speakers' ability to obtain judicial rulings that might deter the agency's speech-chilling

---

[15] John Woodrow Cox, *Trump Administration Makes Misleading Case in High-Stakes Asylum hearing*, Wash. Post (Oct. 30, 2025), https://www.washingtonpost.com/investigations/2025/10/30/trump-asylum-afghanistan-deport-immigration [archive.is/MdVWN].

[16] Decl. of Movant Jon Doe in Supp. of Mot. to Quash Admin. Subpoena, *Doe v. U.S. Dep't of Homeland Sec.*, No. 5:26-mc-80026 (N.D. Cal. Feb. 2, 2026), ECF No. 1-7 at ¶¶ 4–8, *available at* https://storage.courtlistener.com/recap/gov.uscourts.cand.463612/gov.uscourts.cand.463612.1.7.pdf.

[17] *Id.* at ¶¶ 11, 24–25.

[18] *Id.* at ¶¶ 30–37.

abuses.[19] DHS has deployed similar "Immigration Enforcement Subpoena[s]" to target protected online speech, withdrawing the administrative subpoenas when users move to quash.[20]

Federal judges, meanwhile, have issued preliminary injunctions against DHS leadership retaliating against ICE protestors, ICE observers, and reporters. *Tincher v. Noem*, 816 F. Supp. 3d 931, 983 (D. Minn. 2026), *appeal filed*, 26-1105 (8th Cir. Jan. 20, 2026); *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1190 (9th Cir. 2026). One judge, for instance, recounted the "drawing and pointing of weapons; the use of pepper spray and other non-lethal munitions; actual and threatened arrest and detainment of protesters and observers; and other intimidation tactics" by ICE agents. *Tincher*, 816 F. Supp. 3d at 969.

Streever is not alone in being targeted by DHS for protected speech. He is not even the only New Yorker *that day* to receive a bogus "WARNING NOTICE" from Special Agents Brodie and Henry over protected online speech about Operation Metro Surge. On the same Tuesday that Special Agents Brodie and Henry visited Streever's Rochester home, they entered a polling place in Syracuse to confront a woman over her social media usage, issuing her a "WARNING NOTICE" like the one left for Streever. *Id*. ¶¶ 100–03. When the woman drew public attention to

---

[19] *See* Richard Salgado, *Skirting Judicial Scrutiny by Mooting and Scooting*, Lawfare (Feb. 26, 2025, 2:00 PM), https://www.lawfaremedia.org/article/skirting-judicial-scrutiny-by-mooting-and-scooting [perma.cc/MP6U-USYZ].

[20] *E.g.*, Motion to Quash Subpoena, *Doe v. U.S. Dep't of Homeland Sec.*, No. 3:25-mc-80286 (N.D. Cal. Sept. 18, 2025), ECF No. 1, *available at* https://storage.courtlistener.com/recap/gov.uscourts.cand.456560/gov.uscourts.cand.456560.1.0.pdf (targeting anonymous "@LBProtest" account for posts naming and adding agents to a "wall of shame"); *see also* Notice of Vol. Dismissal, *Doe v. U.S. Dep't of Homeland Sec.*, No. 5:26-mc-80026 (N.D. Cal. Feb. 10, 2026), ECF No. 8 at 3, n.1 (citing cases), *available at* https://storage.courtlistener.com/recap/gov.uscourts.cand.463612/gov.uscourts.cand.463612.8.0_1.pdf.

the notice, DHS issued a comment on social media claiming she had "committed a FEDERAL CRIME" and "will face the consequences."[21]

**After news breaks of Streever's plight, DHS announces it will persist targeting Streever over his speech.**

The media soon broke news of DHS's actions against Streever. In response, a DHS spokesperson told the media DHS is now conducting an "ongoing" investigation because it "investigates all credible threats … to the ICE Director."[22] And when Streever filed this action, DHS used its official X account to comment to its 2.9 million followers about Streever:[23]

> Any allegation DHS and its components are attempting to 'squash' free speech is categorically FALSE.
>
> ICE investigates all credible threats towards its employees and officers, including threats to the ICE Director. As a matter of policy, we do not comment on any ongoing investigations.
>
> […]
>
> ANYONE who assaults or threatens our law enforcement officers will face the consequences.

Streever wants to keep criticizing ICE, DHS, and Trump administration officials, but because of Defendants' extraordinary efforts to track down and threaten him over that exact type of criticism, and the "ongoing" investigation, he does not know what he can safely say. Verified Compl. ¶¶ 96, 108–13. His fear of further retaliation from ICE agents for his email or future

---

[21] Homeland Security (@DHSgov), X (June 27, 2026, 1:36 PM), https://x.com/DHSgov/status/2070924224588386349 [perma.cc/NWD2-4DVA].

[22] Jude Joffe-Block, *He Sent a Harsh Email to ICE's Top Official. 5 Months Later, Federal Agents Tracked Him Down*, NPR (July 1, 2026, 5:00 AM), https://www.npr.org/2026/07/01/nx-s1-5874124/dhs-tracks-ice-critic [perma.cc/3NQK-SBM8].

[23] Homeland Security (@DHSgov), X (July 6, 2026, 3:06 PM), https://x.com/DHSgov/status/2074208845974267678 [].

criticism of ICE or DHS has led him to self-censor, avoiding comments about ICE and the federal government's anti-immigration activities to friends and others. *Id.* ¶¶ 96, 110.

## ARGUMENT

This Court should preliminarily enjoin Defendants' ongoing conduct targeting Streever's exercise of First Amendment freedoms, because Streever is likely to succeed on the merits of his First Amendment claims. His email is protected political speech and petitioning activity at the First Amendment's core, and Defendants cannot meet their heavy burden to show otherwise. And by trying to coerce Streever into silence and retaliating against him for criticizing ICE leadership and actions, Defendants are violating the First Amendment twice over, which all but necessarily means the remaining requirements for a preliminary injunction are met. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (listing the factors courts consider on a preliminary injunction motion); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("Were the Archdiocese to show a likelihood of success on the merits . . . it would prevail on the final three factors because the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citations omitted) (cleaned up).

In addition to the irreparable harm presumed from Defendants' First Amendment violations, Streever will also continue to "suffer irreparable harm in the absence of preliminary relief," *Winter*, 555 U.S. at 20, given that Defendants have issued an official notice claiming (wrongly) that his email violates federal law and threatening consequences if he "continue[s] to be involved" in "criminal activities." Verified Compl. ¶ 80, Ex. 2. And an "injunction is in the public interest" as "the balance of equities tips in [his] favor," *Winter*, 555 U.S. at 20, because stopping

Defendants' conduct will uphold the freedoms to criticize and petition the government that is vital to our nation's promise of self-government.[24]

## I.    Plaintiff Is Likely to Prevail on the Merits of His First Amendment Claims.

Streever is likely to succeed on his First Amendment speech and petition claims for unconstitutional coercion and retaliation because the First Amendment squarely protects his right to share unvarnished opinions with government officials—who pledge to serve Streever and every other American—free from punishment or censorship, especially given the breathing room guaranteed for speech on public affairs. Defendants' official demand that he stop speaking—and their extreme efforts to make that demand clear—violate the First Amendment's bar against coercion and prior restraints. And it is also unconstitutional retaliation, as Defendants' practice of issuing abusive notices to government critics would chill an ordinary person from criticizing DHS officials, just as Defendants intend. The only ground the Government has offered as a fig leaf for its censorial intimidation, that the email is an unlawful "threat," defies both Supreme Court precedent and the email's wholly nonviolent text.

### A.    Streever's email is political expression at the First Amendment's zenith.

Streever's email to a senior government official about his agency's policies and practices is political speech at the heart of the First Amendment's protection. In fact, Streever's speech is doubly shielded under the First Amendment's Speech and Petition clauses. Defendants have no hope of showing otherwise, as Supreme Court precedent and our nation's long tradition of a liberty to criticize the government—no matter how harshly—stands in their way.

---

[24] The balance of equities and public interest factors on a motion for preliminary injunction "merge when, as here, the Government is the opposing party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting in part *Nken v. Holder*, 556 U.S. 418, 435 (2009)) (cleaned up).

12

### 1.    An email to a senior official about contested policies is political speech receiving the most robust First Amendment protection.

The email Defendants single out in the "WARNING NOTICE" is an unmistakable exercise of "core political speech," where the First Amendment's protection is "at its zenith." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999) (internal quotation marks omitted). "Political speech must receive the highest level of First Amendment protection," owing "in large part [to] the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment." *Guffey v. Mauskopf*, 45 F.4th 442, 446 (D.C. Cir. 2022) (cleaned up); *see also Bridges v. California*, 314 U.S. 252, 263 (1941) (the "First Amendment does not speak equivocally" in prohibiting the abridgment of the freedom of speech, and so "must be taken as a command of the broadest scope that [its] explicit language, read in the context of a liberty-loving society, will allow"). To provide that robust protection for speech and self-government, the Constitution ensures "breathing space" for "delicate and vulnerable" First Amendment freedoms, because even the mere "*threat* of sanctions may deter their exercise almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963) (emphasis added). To avoid that risk, our legal system gives wide berth to speech on matters of political and social concern, a testament to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *Sullivan*, 376 U.S. at 270.

Streever's email self-evidently contributes to conversation on the public issues dominating our political system. The administration's policies divided administration officials and the legislative branch. The killings in Minnesota spurred protests across the country. Impassioned appeals to conscience and challenges to moral values are woven into our political traditions. Recall, for example, attorney Joseph Welch challenging Sen. Joseph McCarthy's morals—"Until

13

this moment, senator, I think I have never really gauged your cruelty or your recklessness"—and pleading with him to stop: "Have you no sense of decency, sir? At long last, have you no sense of decency?"[25]

The American tradition of political castigation is alive and well, often in acerbic tones that make Streever's email mild in comparison. Look no further than former ICE Director Lyons' own experience when he took the hot seat before the House Committee on Homeland Security on February 10, as public debate over the Minneapolis shootings continued. Multiple members of Congress, channeling public anger and echoing the sentiments in Streever's email, condemned Lyons. They compared ICE's conduct to the Nazi regime, urged him to end ICE practices they compared to the "secret police" of the Soviet Union, appealed to Lyons' conscience and religious views, and encouraged him to resign. One Congresswoman pointedly asked: "How do you think Judgment Day will work for you with so much blood on your hands? … Do you think you're going to hell, Mr. Lyons?"[26]

Some would chafe at the Representatives' rhetorical slings and arrows, appealing (as the hearing chair did) to notions of decorum. But the First Amendment does not distinguish between the offensive and inoffensive, leaving "taste and style" to the speaker, not the government. *Cohen v. California*, 403 U.S. 15, 25 (1971). Criticism of public servants presents no exception: "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on

---

[25] Andrew Glass, *Sen. Joe McCarthy Assailed by Army Counsel, June 9, 1954*, Politico (June 9, 2017, 12:30 AM), https://www.politico.com/story/2017/06/09/sen-mccarthy-assailed-by-army-counsel-june-9-1954-239144.

[26] House Committee on Homeland Security, Oversight of the Dep't of Homeland Security: ICE, CBP, and USCIS, YouTube (Feb. 10, 2026), https://www.youtube.com/watch?v=4KE7UGRHK_8 at 1:23:01–1:24:14 (contrasting Director Lyons' "decorated career" with his "decision" to continue working for ICE in light of "the dishonorable acts" of subordinates), 3:23:13–3:25:02 (predicting President Trump will turn on Lyons), 2:10:27–2:12:08 (comparisons of "secret police" tactics to Nazi regime), 2:42:30–2:45:11 (questions about eternal damnation).

all public institutions." *Bridges*, 314 U.S. at 270. And so the freedom to criticize these "public men and measures" extends not only to "informed and responsible criticism," but also includes the liberty to "speak foolishly and without moderation." *Baumgartner v. United States*, 322 U.S. 665, 674 (1944).

Our Constitution requires government officials to withstand "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. And it requires law enforcement—from the common patrol officer to ICE leadership—to be "expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently" to criticism from the public. *Hill*, 482 U.S. at 462 (cleaned up). In short, the First Amendment provides breathing space that requires political leaders and law enforcement officials to endure barbed speech—and Lyons was both.

### 2.    The Petition Clause also protects Streever's email.

Streever is likely to succeed on the merits especially given that Defendants have violated not only the First Amendment's Speech Clause, but also its Petition Clause. The Speech and Petition clauses "share substantial common ground," as the "right to speak and the right to petition are cognate rights." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) (cleaned up). The Petition Clause complements the Speech Clause by separately protecting communications directed to government officials seeking governmental action or redress. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414–16 (1979) (holding that the First Amendment protects speakers who "communicate privately" with government officials just as it protects speakers who "spread [their] views before the public"); *McDonald v. Smith*, 472 U.S. 479, 482–85 (1985).

Because Streever's email lies at the intersection of the Speech and Petition Clauses, DHS's Notice violates two First Amendment guarantees at once. It targets Streever's speech because of its dissenting message. And it targets his petitioning because of its audience: a high-ranking law

enforcement official with authority over the grievance Streever raised. True, the Petition Clause does not obligate the government to read or respond to a petition. *We the People Found., Inc. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007). ICE was free not to respond at all. But under our Constitution, it *was* forbidden from sending agents to badger Streever into ceasing petitioning and speaking about his government.

### 3.    Defendants cannot meet their heavy burden to show the First Amendment does not protect Streever's solitary email.

Defendants are violating the First Amendment at every turn. There is no constitutional basis Defendants can invoke to justify their efforts to coerce Streever into silence and retaliate against his criticism. *See* infra, § I.A.3. Nor can they turn Streever's protected speech into a crime by merely reciting a federal code section. Verified Compl. Ex. 2 (reciting vaguely in the Notice several federal statutes and gesturing broadly at thousands of other statutes in Title 18); *cf. Mink v. Knox,* 613 F.3d 995, 1003–04 (10th Cir. 2010) (confirming an "official may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment") (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). And any claim that Streever's email somehow lacks First Amendment protection altogether comes with a considerable burden—one Defendants will not be able to meet—to show that it falls within one of the few "well-defined and narrowly limited" categorical exceptions to First Amendment protection. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quotation omitted); *cf. United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) (government's burden); *Counterman v. Colorado*, 600 U.S. 66, 79 (2023) (true threats).

Streever's email falls nowhere near any of those narrow, rigidly defined categories of unprotected speech. *Stevens*, 559 U.S. at 468–69. The only unprotected category of speech Defendants have suggested is true threats, as the Notice mentions "threats made against ICE

16

personnel." Verified Compl. Ex. 2. But Defendants cannot strip Streever's government criticism of First Amendment protection simply by branding it a "threat." *See Button*, 371 U.S. at 429 ("a State cannot foreclose the exercise of constitutional rights by mere labels").

Instead, to satisfy constitutional guardrails, Defendants must meet both the objective and subjective prongs required to establish a "true threat." *See Counterman*, 600 U.S. at 72–73; *see also Accountability NOW USA v. Griess*, No. 26-1385 (RDM), 2026 WL 1870626, at *14–*20 (D.D.C. June 29, 2026) (granting preliminary injunction over protester's use of the idiom "8647"). "The inquiry is twofold: whether a reasonable person would perceive the statement as threatening, and whether the speaker was subjectively aware of its threatening nature." *United States v. Jubert*, 139 F.4th 484, 491 (5th Cir. 2025) (citing *Counterman*, 600 U.S. at 72–73). Defendants cannot establish either prong. Yet no objectively reasonable person aware of the text and context of Streever's email would interpret it as a serious expression of an intent to commit violence. Nor is there any evidence Streever consciously disregarded a substantial risk his criticism would be interpreted as a threat of violence. *Counterman*, 600 U.S. at 69.

On the objective prong, Defendants falter right out of the gate. A statement is a true threat only where a "reasonable person would consider the statement a serious expression of an intent to inflict harm." *Accountability NOW USA*, 2026 WL 1870626, at *14 (quoting *United States v. Syring*, 522 F. Supp. 2d 125, 129 (D.D.C. 2007)). The statement in context must be "convey a real possibility that violence will follow" and that the speaker seriously "means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (internal quotation marks omitted). And because they are not serious expressions of that intent, neither rhetoric nor hyperbole can constitute an unprotected true threat. *Watts v. United States*, 394 U.S. 705, 708 (1969). Courts consider the "entire factual context," including the "reaction of the recipient" and "of other listeners[.]"

17

*Accountability NOW USA*, 2026 WL 1870626, at \*14 (internal quotation marks omitted)*; see also Watts*, 394 U.S. at 707 (audience reacted with laughter to remark about shooting the president). That context necessarily includes the broader "political arena," where the language used "is often vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708.

No objective person could read Streever's email as a serious expression of an intent to engage in violence. *See* Verified Compl. ¶ 70, Ex. 1. The email's text contains no reference to violence—save for its condemnation of violence committed by ICE agents. *Id.* Streever made no effort to conceal his identity, sending the email using his full name and photograph. *Id.* He predicted only that Director Lyons' *conscience* would "torment" him and never allow him "peace." *Id.* The email uses impassioned language common to political discourse. *Watts*, 394 U.S. at 708. Streever's email, devoid of even the express hyperbolic references to violence the Court held protected in *Watts*, cannot be objectively construed as reflecting an intent to commit violence. Any other conclusion tortures the email's plain text.

Consider also the "reaction of the listeners" here, ICE and its agents. *See Watts*, 394 U.S. at 708. ICE waited five months before targeting Streever over his solitary email. Verified Compl. ¶¶ 68, 71–72. And even the agents tasked with delivering the Notice to Streever suggested they were not confident the email was threatening at all, telling Streever's wife he "may or may not" have threatened Director Lyons. Decl. Rev. Streever ¶ 8.

Because Streever's email is not a true threat under the objective prong of the true threats analysis, the Court can conclude its review there. In *Accountability NOW USA*, Judge Moss did just that, holding that because "no reasonable person, aware of the relevant circumstances, would regard [the speech] to represent 'a serious expression of an intent to commit an act of unlawful violence,'" the protest flag could not be construed as a true threat. 2026 WL 1870626, at \*15

18

(quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Accordingly, "the Court need not … base its decision on" subjective awareness of the speaker. *Id.*

Even if Defendants *could* clear the objective hurdle, that subjective prong falls against them as well. The First Amendment's preference for "breathing room" obligates the government to make a showing of the *subjective* mental state of the speaker. *Counterman*, 600 U.S. at 75–80, 82. So the Government bears a burden to also show Streever "consciously disregarded a substantial risk that his communication[] would be viewed as threatening violence." *Id.* at 69. The Government has no such evidence and could develop none, as Streever did not and could not disregard a risk that did not exist. Verified Compl. ¶ 122. The only "threats" conveyed by the email were that of history's judgment about Lyons' own legacy, and what he might suffer from his own conscience.

The "breathing room" *Counterman* recognized as necessary in the context of the "true threats" exception is particularly important because political expression often invokes themes of violence. Our nation's history reveals as much. Recall, for example, Thomas Jefferson's famous remark that the "tree of liberty must be refreshed from time to time with the blood of patriots & tyrants,"[27] or Benjamin Franklin's violence-praising motto proposed for the Seal of the United States: "Rebellion to Tyrants is Obedience to God."[28] Or take the renowned abolitionist and free speech advocate, Frederick Douglass, who, in vigorously opposing the Fugitive Slave Act,

---

[27] Letter from Thomas Jefferson to William Stephens Smith (Nov. 13, 1787), Library of Congress, *available at* https://www.loc.gov/exhibits/jefferson/105.html.

[28] *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 469 (6th Cir. 2003) (Ryan, J., dissenting) (citing James H. Hutson, *Religion and the Foundation of the American Republic* 50–51 (1998)).

remarked that "[e]very slave-hunter who meets a bloody death in his infernal business, is an argument in favor of the manhood of our race."[29]

More-contemporary examples abound. Consider the Vietnam War draftee who pledged that if conscripted and made to carry a rifle, "the first man I want to get in my sights is [President] L.B.J." *Watts*, 394 U.S. at 706. In that seminal "true threats" case, the Supreme Court looked to the broader political context and the nature of "language of the political arena" consisting of "vituperative, abusive, and inexact" speech to conclude the statement was "political hyperbole" protected under the First Amendment. *Id.* at 708. Twenty years later, the Court similarly held the First Amendment protected a clerical employee's remark, upon hearing that President Reagan had been shot, that she did not care for his policies and that "if they go for him again, I hope they get him." *Rankin v. McPherson*, 483 U.S. 378, 381, 387 (1987). Or consider Judge Moss's recent application of the "true threats" standard in the context of the government's hyper-caffeinated claims that "8647" protest signs could be construed as threats to murder ("86") President Trump ("47"). *Accountability NOW USA*, 2026 WL 1870626 at *1, *14–*20 (converting motion for preliminary injunction into summary judgment and permanently enjoining federal officials from threatening to revoke the plaintiff's demonstration permit).

Streever's considerably less inflammatory email deserves the same breathing room the First Amendment afforded the speakers in the cases above, as it comes nowhere near meeting either the objective or subjective "true threats" prongs. And it accordingly cannot justify Defendants' requests that he remove or discontinue his criticism of any high-ranking (or other) federal officials.

---

[29] Frederick Douglass, "Is it Right and Wise to Kill a Kidnapper" (June 2, 1854), https://www.contextus.org/Frederick_Douglass%2C_Is_it_Right_and_Wise_to_Kill_a_Kidnapper_(Jun_2%2C_1854).10.

**B.      Streever is likely to succeed on his first cause of action because Defendants' coercion tactics violate the First Amendment.**

By any measure, federal agents tracking down a government critic and delivering a thinly veiled threat to be quiet or suffer criminal consequences violates the First Amendment. Of this, the Supreme Court has left no doubt: "[R]elying on the 'threat of invoking legal sanctions and other means of coercion ... to achieve the suppression' of disfavored speech," as Defendants are doing, is unconstitutional. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). That is why Streever is likely to succeed on his first cause of action, centered on Defendants' efforts to coerce him into silence.

**1.      The First Amendment prohibits government officials from using the coercive power of the state, in all forms, to silence speakers.**

The First Amendment "eschew[s] silence coerced by law—the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring). So if the government wants to respond to dissent or unpopular views, it must do so with "tolerance, not coercion." *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023). Of course, officials can vocally disagree with their critics and even try to persuade the Americans they serve of the merits of government policy and action. But what officials cannot do—in any form—"is use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am.*, 602 U.S. at 188 (citation omitted). When government officials "threaten[] to employ coercive state power to stifle protected speech," they violate the First Amendment, "regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) ("[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is

21

violating the First Amendment") (quoting *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

To that end, courts have upheld the First Amendment against all forms of the government flexing its power to coerce Americans into silence. For instance, judges in this District have enjoined federal officials from enforcing executive orders targeting law firms that express disfavored viewpoints and represent disfavored clients, uniformly noting how those orders aim to coerce speakers into silence. *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 120–21 (D.D.C. 2025), appeal docketed, No. 25-5241 (D.C. Cir. July 2, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 153 (D.D.C. 2025), appeal docketed, No. 25-5277 (D.C. Cir. July 28, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94–97 (D.D.C. 2025), appeal docketed, No. 25-5265 (D.C. Cir. July 22, 2025). As another example, a federal court held a mayor violated the First Amendment by dispatching plain-clothes police officers to discourage newsstands from distributing *Hustler* magazine, intimating that cessation would avoid future sweeps and prosecutions. *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 419, 425 (W.D. Pa. 1984).

In fact, the Supreme Court and other courts have affirmed the government violates the First Amendment when it coerces a *third party*, under the threat of civil or criminal sanction, into not doing business with a disfavored speaker as a mode of punishing that speaker. *E.g., Nat'l Rifle Ass'n of Am.*, 602 U.S. at 190–91; *Bantam Books, Inc.*, 372 U.S. at 67; *Backpage.com,* 807 F.3d at 235, 238–39; *Playboy Enterprises, Inc. v. Meese*, 639 F. Supp. 581, 582–88 (D.D.C. 1986). If the government cannot use threats and other coercion to enlist a third party to suppress disfavored speech, it certainly cannot deploy agents to *directly* threaten and coerce a disfavored speaker, as

22

Defendants are doing with Streever. *See Nat'l Rifle Ass'n of Am.*, 602 U.S. at 190 ("[A] government official cannot do indirectly what she is barred from doing directly.")

### 2. Defendants are violating the First Amendment by trying to coerce Streever into silence.

Streever's chilling experience leaves no doubt: Defendants are employing coercive state power to stifle his protected speech. They deployed agents to Streever's home. They served his wife with threats of criminal sanction masquerading as a "WARNING NOTICE" that insists Streever stop criticizing ICE and warns his protected speech could "subject him to both federal and state prosecution." Verified Compl. ¶¶ 79–80, Ex. 2. And if that were not alarming enough, Defendants surveilled Streever, then pursued him to his hotel hundreds of miles away, and left ominous, anonymous voicemails, all to ensure they had his attention.

It's not a close call. Defendants are violating the First Amendment's staunch protections against the government coercing speakers into silence.

When assessing First Amendment coercion, courts "look through forms to the substance" of government conduct, because even "informal censorship" through "other means of coercion, persuasion, and intimidation" violates the First Amendment. *Bantam Books*, 372 U.S. at 64. To that end, courts often employ "a multifactor test or a totality-of-the-circumstances analysis." *Nat'l Rifle Ass'n of Am.*, 602 U.S. at 189–90 (collecting cases). Those factors include "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 189 (reciting the Second Circuit's multifactor test).

Applying these and similar factors, several decisions have held government officials violated the First Amendment through censorial efforts like the "WARNING NOTICE" here. The Supreme Court's decision in *Bantam Books* is a prime example. The Court held that injunctive

relief was warranted to prevent a state commission from sending threatening notices to distributors of books the commission deemed obscene. *Bantam Books*, 372 U.S. at 67. The "notices, phrased virtually as orders," were "reasonably understood to be such by the distributor." *Id.* at 68. And although the commission lacked direct authority to enforce criminal law, its authority to refer matters for prosecution sufficed to underscore the notice's coercive effect. *Id.* "[T]he threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," the Court held, "amply demonstrates that the Commission deliberately set about to achieve the suppression" of speech. *Id*. at 67.

So too here. The Notice tells Streever to cease his "behavior" (*i.e.*, directly criticizing ICE officials), threatens "federal and state prosecution," and calls for Streever to signify his acknowledgment via signature. Verified Compl. ¶ 80, Ex. 2. And Streever understood the notice as akin to an order against criticizing ICE in the future. Who wouldn't?

In fact, Defendants' actions are even more coercive than the commission's in *Bantam Books*. Unlike the commission in that case, DHS and ICE *do have* law enforcement authority. And that's something Defendants wanted Streever to know: The Notice states that ICE "is responsible for enforcing crimes against the United States." The message would be clear to any American— "we have the power to punish you, so stop criticizing us." That is precisely the type of "threat[] to employ coercive state power to stifle protected speech" that violates the First Amendment. *Okwedy*, 333 F.3d at 344.

The Seventh Circuit's decision in *Backpage v. Dart* is instructive. The court held a sheriff violated the First Amendment by trying to coerce credit card companies into ceasing business with Backpage.com, a website that included adult-themed classified ads—protected speech the sheriff sought to stifle through economic starvation. *Backpage.com*, 807 F.3d at 230, 235. In reaching its

holding, the court explained the sheriff "is not permitted to issue and publicize dire threats against credit card companies that process payments made through Backpage's website, including threats of prosecution (albeit not by him, but by other enforcement agencies that he urges to proceed against them), in an effort to throttle Backpage." *Id.*

At the holding's core was a letter Sheriff Dart sent to the companies, echoing in large part the Notice here. It was captioned "Office of the Sheriff," *id.* at 23, just as Defendants' Notice has the caption "U.S. IMMIGATION AND CUSTOMS ENFORCEMENT/U.S. DEPARTMENT OF HOMELAND SECURITY." Verified Compl. ¶ 80, Ex. 2. It used legal terms like "cease and desist," *Backpage.com*, 807 F.3d at 232, mirroring how Defendants' notice uses terms like "officially informs," "authorized," and "constitute a violation of," Verified Compl. ¶ 80, Ex. 2. And like Sheriff Dart's letter, *Backpage.com*, 807 F.3d at 231, the "WARNING NOTICE" cites federal statutes. Verified Compl. ¶ 80, Ex. 2 (citing all of Title 18 and 18 U.S.C. §§ 115(a), 119).

But there is one key difference rendering Defendants' notice even more coercive. In reciting a federal statute in his letter, Sheriff Dart merely "intimat[ed] that the credit card companies could be prosecuted." *Backpage.com*, 807 F.3d at 232. The "WARNING NOTICE," on the other hand, *directly* (and wrongly) asserts to Streever that his protected speech is a crime that could lead to "federal and state prosecution," while accusing him of "being involved in criminal activities." Verified Compl. ¶ 80, Ex. 2. If a government official simply "intimating" prosecution by a third-party is enough to violate the First Amendment's bar against coercive threats, Defendants' unequivocal and *direct* threat to prosecute does so, too.

That's especially so because Defendants hand-delivered that threat to Streever's home— and then followed up on it by tracking down Streever at his hotel. Verified Compl. ¶¶ 71–80, 90– 94. Those intimidation tactics are no trifling threat to free expression. They are actionable precisely

25

because they are "likely to deter a person of ordinary firmness" from exercising their First Amendment right to criticize government officials. *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002). This Court should intervene swiftly to stop the intolerable chilling effects of Defendants' coercive threats and intimidation.

There is even more reason for the Court to step in. "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Backpage*, 807 F.3d at 235 (quoting *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)); *cf. Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (affirming prior restraints are "the most serious and the least tolerable" of all First Amendment violations). That's exactly what Defendants are doing here. By "requesting that [Streever] promptly remove and/or discontinue" his "behavior" of criticizing ICE officials under threat of criminal penalties, the "WARNING NOTICE" not only targets Streever's email to Lyons, but his future expression as well. Verified Compl. ¶ 80, Ex. 2.

### C.    Streever is likely to succeed on his retaliation cause of action because Defendants' conduct would chill a reasonable person from speaking.

Defendants' actions meet every element of a claim of retaliation under the First Amendment, which "prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). A government official engages in unconstitutional retaliation when (1) he targets activity protected by the First Amendment; (2) the adverse action is of such a character that it would deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's action. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). That describes exactly what Defendants are doing here.

26

Defendants readily meet the first and third elements of a retaliation claim—protected expression and causal relationship. As discussed above, the First Amendment protects Streever's email, and the Notice expressly cites it as motivating Defendants' response. Verified Compl. ¶ 80, Ex. 2 ("OPR has identified an email sent to Acting Director Todd Lyons"). And Defendants' long track record of going after critics underscores their retaliatory motive. *See* supra pp. 8–9.

That leaves the second element, which Streever just as easily satisfies. The "adverse action" element is an objective inquiry, met where the "retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005)). The "bar" to show retaliatory conduct "is not a high one." *Jenner & Block LLP*, 784 F. Supp. 3d at 95 n.7. Thus, actions falling far short of an arrest or direct regulation may amount to adverse action. *E.g.*, *Cooksey v. Futrell*, 721 F.3d 226, 231, 236–37 (4th Cir. 2013) (holding a "person of ordinary firmness would surely feel a chilling effect" where an agency official told plaintiff "he and his website were under investigation," and that while the agency tries "to resolve complaints informally," it did have "statutory authority to seek an injunction").

Consider *Hartley v. Wilfert*, in which Secret Service officers hassled a demonstrator outside the White House. 918 F. Supp. 2d 45, 48 (D.D.C. 2013). The demonstrator, a former police officer, undertook a 225-mile walk from Pennsylvania to the White House. *Id.* She carried a sign and hoped to "meet with Michelle Obama to express her concerns about sex discrimination in law enforcement." *Id.* at 47. When guards declined to let the demonstrator in, she remained "on the sidewalk in front of the White House … answering tourists' questions regarding her concerns[.]" *Id.* at 48. There she was twice met by law enforcement—first by several officers supportive of her message, then by uniformed Secret Service officers who "briefly approached." *Id.* at 48, 53. One

27

officer correctly told her that "if you want to protest, you can," but that officers would have to collect "background data" from her and record it in "Secret Service records." *Id.* at 53–54. That meant that the demonstrator would be on a "list" and "considered one of the crazies who protest in front of the White House." *Id.* at 54.

Although the encounter in *Hartley* was "brief," some officers supported her message, and she was not threatened with even a possibility of an arrest, the alleged conduct met the objective "person of ordinary firmness" test. *Id.* at 54. The defendant officer was not simply "collecting information, he was engaged in intimidating [the demonstrator] from exercising her First Amendment rights." *Id.* at 56. In denying a motion to dismiss, the district court rejected defendants' invitation to bend the objective "ordinary firmness" test to consider the demonstrator's subjective qualities (*i.e.*, that a former police officer should not be deterred by verbal warnings from another officer). *Id.* at 54.

Defendants' conduct here—forwarding a "WARNING NOTICE" to Streever through his wife, attempting to confront him late at night in a hotel, and publicly declaring they are *still* conducting an "ongoing investigation"[30]—is more chilling than the brief encounter that qualified as adverse action in *Hartley*. That is by design. ICE is not seeking to educate people about the law or gathering information about threatening behavior. It has set about to *prevent* government criticism through organized intimidation. These facts would chill a person of ordinary firmness for the same reasons they reveal retaliative intent.

---

[30] Just as the database of "crazies" in *Hartley* was sufficient to establish adverse action, the Defendants here maintain a database ("ICE Intelligence Records Systems") to record information about people alleged to have made a "credible threat"—as Defendants baselessly claim Streever did. 90 Fed. Reg. 34,282 (July 21, 2025); Verified Compl. ¶ 104.

In the United States, public servants like Lyons must answer speech with speech—not with federal agents showing up on a front porch to hand-deliver an official government "WARNING NOTICE." Defendants' conduct is designed to chill speech, and the Court should swiftly enjoin it.

## II.    Plaintiff Will Suffer Irreparable Harm Absent an Injunction.

Because Streever is likely to succeed on the merits, the remaining factors necessarily weigh in favor of a preliminary injunction. *See Archdiocese of Wash.*, 897 F.3d at 334 (D.C. Cir. 2018); *WallBuilder Presentations v. Clarke*, No. CV 23-3695 (BAH), 2024 WL 2299581, at *16 (D.D.C. May 21, 2024) (holding that because the movant "has shown a likelihood of success on the merits . . . [i]t follows, therefore, that [the movant] has satisfied the other three factors") (citing decisions). And should this Court consider the remaining factors further, each strongly favors a preliminary injunction.

In violating the First Amendment, Defendants have met their goal—chilling Streever's speech. That is irreparable injury by definition: "loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable injury. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Here, Defendants' acts "have already violated and continue to violate [Streever's] First Amendment rights because … they result in self-censorship and the chilling of First Amendment expression." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020). Those unconstitutional acts—and the resulting irreparable injury to Streever—will continue absent a preliminary injunction.

As his email to then-Acting Director Lyons shows, Streever values exercising his constitutional right to criticize ICE officials. But now, with Defendants' "WARNING NOTICE" and the prospect of more visits (or worse) hanging over his head, Streever fears exercising that right. Verified Compl. ¶¶ 96, 110. The notice ominously warns the recipient that its delivery has been "documented" and will be "taken into consideration" if he refuses to silence himself. *Id.* ¶ 80,

29

Ex. 2. And by tracking Streever to his hotel in New York City and telling reporters ICE is continuing to "investigate" him, Defendants have confirmed the agents' visit to his home was not one-and-done. *Id.* ¶¶ 90–94, 104.

Defendants' message was not subtle; it was not even subtext. Threatened with specific criminal charges if he does not "discontinue" criticizing ICE, Streever reasonably fears *any* speech critical of ICE will bring federal agents to his doorstep once more. "People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Bantam Books,* 372 U.S. at 68. And this case is no exception.

Even worse, Streever has no way of knowing what speech might trigger future sanctions. Defendants claim to be investigating "credible threats" against the ICE Director, Verified Compl. ¶ 104, but the Notice specifies nothing in Streever's email that Defendants consider a "credible threat," Verified Compl. Ex. 2. That's no surprise, because his email lacks even an inkling of a threat. *See supra* § I.A.3. But the notice's vague warnings are the point. They force Streever—and any other critic—to guess whether their next email, tweet, or blog post will lead to ICE agents descending on their home, workplace, or hotel room. That poses a dire choice: be quiet, or risk enduring the state's retaliatory wrath.

This Court can prevent that speech-chilling outcome and further irreparable harm to Streever's constitutional rights by enjoining Defendants from carrying out their coercive and retaliatory schemes, as have other courts before in similar circumstances. *See Backpage.com*, 807 F.3d at 239 (enjoining Sheriff Dart from taking any "actions, formal or informal, to coerce or threaten" the credit card companies in his crosshairs); *Bantam Books*, 372 U.S. at 67, 72 (reversing the denial of injunctive relief against the commission's "informal censorship"); *Playboy Enterprises*, 639 F. Supp. at 587–88 (enjoining officials from sending letters to "discourage

30

distributors from selling" certain publication under the threat of blacklisting, "a form of pressure amounting to an administrative restraint of the [publishers'] First Amendment rights"). Recently, the D.C. Circuit affirmed a preliminary injunction stopping a retaliatory investigation against a media company that published an article about online political extremism, after it caused the media company to self-censor even before the government took direct enforcement action. *Paxton*, 138 F.4th at 585 (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)). Other examples abound. *E.g., Tincher*, 816 F. Supp. 3d at 983–84 (enjoining DHS and ICE officials from using force and other retaliatory tactics against protestors and observers); *Los Angeles Press Club*, 171 F.4th at 1190 (affirming issuance of a preliminary injunction against the DHS Secretary, based on DHS officials using force against journalists in retaliation for reporting on anti-ICE protests).

## III.    The Public Interest and Balance of Equities Overwhelmingly Favor an Injunction.

Defendants' speech-chilling acts strike at the freedom to criticize the government, a right the First Amendment fiercely protects for every American. Enjoining Defendants from carrying out those acts will serve the public well, ensuring it maintains the freedom to engage in speech at the heart of self-government. *See Guffey*, 45 F.4th at 446 (affirming "the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment").

"It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." *Paxton*, 138 F.4th at 585. This factor thus requires "weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Turner*, 502 F. Supp. 3d at 386. That tips heavily toward a preliminary injunction, as "'[t]he Constitution is the ultimate expression of the public interest,' and consequently, government actions in contravention of the Constitution are 'always contrary to the public interest.'" *Id.* (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

31

And here, Streever's interest "mirrors that of every person subject to government power: vindicating the right to be free of retaliation for [his] protected speech." *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289, at *14 (D.D.C. May 7, 2026). Whatever Defendants' interest is here, it "may not 'act unlawfully even in pursuit of desirable ends.'" *Paxton*, 138 F.4th at 585. While the government may have an interest in addressing *legitimate* threats to public officials, the First Amendment forecloses any interest in suppressing criticism of its officials' conduct. *See Bridges*, 314 U.S. at 270–71; *Sullivan*, 376 U.S. at 291–92.

The balance of the equities tips even further in favor of a preliminary injunction given the evidence that Streever's experience is just one example of the federal government's ongoing campaign to intimidate critics into silence. *See* Verified Compl. ¶¶ 60–67, 100–06. Such "official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018). When, as here, "retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Id.*

## IV.    The Court Should Not Require Streever to Post a Bond for a Preliminary Injunction.

The Court should exercise its "broad discretion" to "dispense with any security requirement whatsoever" under Federal Rule of Civil Procedure 65(c), as is typical in civil rights cases. *Assoc. Press v. Budowich*, 780 F. Supp. 3d 32, 59–60 (D.D.C. 2025) (quotations omitted) (declining to require a bond in granting preliminary injunction in First Amendment action).

## CONCLUSION

For these reasons, the Court should grant Plaintiff's motion for a preliminary injunction.

32

Dated: July 7, 2026

Respectfully submitted,

/s/ JT Morris
JT Morris, Bar No. 979772
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
jt.morris@fire.org

Adam Steinbaugh, Penn. Bar No. 326475*
Jeffrey Zeman, Penn. Bar No. 328570*
Hannah Abbott, Penn. Bar No. 337123*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION (FIRE)
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
adam@fire.org
jeff.zeman@fire.org
hannah.abbott@fire.org

* *Pro hac vice* application pending.

*Counsel for Plaintiff*

33