**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID STREEVER, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 26-2356 (RC) |
| | : | |
| v. | : | Re Document Nos.: 9, 17 |
| | : | |
| MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, *et al.* | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

## GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE

## I. INTRODUCTION

Americans have long voiced their displeasure with their government. The Declaration of Independence itself is a list of grievances between Americans and the British government. And Americans have not always indulged in the elevated prose of the Declaration. Government officials have long endured "vehement, caustic, and sometimes unpleasantly sharp attacks." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Today is no different. Plaintiff David Streever expressed his displeasure with the United States Immigration and Customs Enforcement ("ICE") by sending a three-paragraph email to the agency's Acting Director, Defendant Todd Lyons. Mr. Streever compared Acting Director Lyons to an infamous Nazi and predicted that he would become "a sad, despised man who eats himself alive with shame at [his] own pathetic weakness."

What *is* different is how the government responded in this case. ICE dispatched agents to Mr. Streever's home and delivered to him a "**WARNING NOTICE**." The notice threatened

him with prosecution if he did not "discontinue" his criticism of ICE. Because that notice likely violates Mr. Streever's First Amendment right to free speech, the Court will grant, in part, Mr. Streever's motion for preliminary injunction, enjoining Defendants from relying on the Warning Notice, issuing similar threats, or making good on the threats in the Warning Notice.[1]

## II. BACKGROUND

Mr. Streever was outraged by the deaths of two Minnesotans, both of whom were shot by ICE officers in January 2026. *See* Verified Compl. ("Compl.") ¶¶ 3–5, ECF No. 1. To register his anger, Mr. Streever sent ICE's Acting Director, Todd Lyons, a three-paragraph email titled "What's next." *Id.* ¶ 68. The email read as follows:

> You are a monstrous human being and will go down in history as America's Reinhard Heydrich, the butcher.
>
> The way you are protecting the obvious execution in Minnesota, even as we see the videos, will lead to your downfall. Even Trump will turn on you before the end, and you will be a sad, despised man who eats himself alive with shame at your own pathetic weakness.
>
> You will never know peace. You will seek to lose yourself, to escape the burden of knowing the truth about yourself. But wherever you go, you will find yourself. You will torment yourself until your last day on Earth.

*Id.*, Ex. 1, ECF No. 1-1.

Mr. Streever's January 26, 2026, email came during an uptick in threats to ICE officers. According to the Assistant Director of the Office of Professional Responsibility ("OPR") Investigations within ICE, Brent Goodwin, "ICE has experienced a 946% increase in threats against ICE officials" between fiscal years 2024 and 2025. Decl. of Brent L. Goodwin

[1] "Defendants" refers collectively to Defendants Markwayne Mullin, David J. Venturella, Jenniver M. Fenton, John Doe (identity unknown), David Brodie, Abbi Henry, and Trevor J. Pitts, all of whom are being sued in their official capacities.

("Goodwin Decl.") ¶ 4, ECF No. 20-1. "In [fiscal year] 2025, ICE OPR investigated approximately 66 potential threats against senior leaders." *Id.*

At some point after ICE received Mr. Streever's email, it "was forwarded to OPR because it was determined that the email had potential threatening undertones to ICE personnel, potentially presenting a safety concern." *Id.* ¶ 7. Because "ICE OPR did not have any information about Mr. Streever . . . OPR determined that it needed to conduct an ICE investigation." *Id.* It is unclear who within ICE made either of these determinations. But the relevant OPR field office is located in Fairfax, Virginia.[2] The case was then assigned to Senior Special Agent Abbi Henry, who worked alongside Senior Special Agent David Brodie. *Id.* ¶¶ 7–8. Both of them work in an ICE OPR office in Jersey City, New Jersey. *Id.* ¶ 8.

As part of their investigation, now five months after Mr. Streever sent his email, Agents Henry and Brodie traveled to Mr. Streever's home in Rochester, New York, to speak with him. *Id.* ¶ 10. But Mr. Streever was not home. *Id.* ¶ 11. He was off traveling in Europe. *Id.* So the agents spoke with Rev. Hilary Streever, Mr. Streever's wife. Comp. ¶¶ 74–76. They told her that Mr. Streever "'may or may not have' sent an email to Todd Lyons, threatening Lyons" and that they "needed to talk to [Mr.] Streever." *Id.* ¶ 76.

The agents then handed Ms. Streever a "**WARNING NOTICE**." *Id.*, Ex. 2, ECF No. 1-2 (emphasis in original); *id.* ¶ 79. The notice stated at the top: "**YOU MAY BE IN VIOLATION OF FEDERAL LAW**." *Id.*, Ex. 2. It then explained:

> U.S. Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR) is responsible for protecting ICE, its employees, and its

[2] *See* Defs.' Combined Mot. Dismiss, Transfer Venue, Hold in Abeyance Br. on Pl.'s Mot. Prelim. Inj., & Extension Time ("Defs.' Mot") at 4, ECF No. 17 ("The ICE OPR office serving New York is in Fairfax, Virginia."); *see also* ICE Field Offs., ICE, https://www.ice.gov/contact/field-offices?state=All&office=13&keyword= [https://perma.cc/E6W7-686R] (last visited Sep. 1, 2026).

> facilities against internal and external threats. OPR is responsible for enforcing crimes against the United States as authorized under Title 19 of the U.S. Code and as designated by the Secretary of Homeland Security, including criminal investigations into threats made against ICE personnel. OPR has identified an email sent to Acting ICE Director Todd Lyons, which it has reason to believe may constitute a violation of Title 18 of the U.S. Code. Accordingly, OPR is requesting that you promptly remove and/or discontinue the aforementioned behavior.
>
> ***This Notice officially informs you that it is unlawful to threaten to assault, kidnap, and/or murder a federal official or that federal official's immediate family member with the intent to impede, intimidate, and/or interfere with the federal official's duties or retaliate against a federal official due to the performance of their duties. 18 U.S.C. § 115(a). You are further advised that knowingly making restricted personal information about a covered person, or their immediate family member, publicly available with the intent to threaten, intimidate, or incite the commission of a crime of violence against the person; or with the intent and knowledge that the restricted personal information will be used to threaten, or intimidate, or facilitate the commission of a crime of violence against that person violates federal law. 18 U.S.C. § 119. Violations of these or related laws could subject you to both federal and state prosecution.***
>
> OPR has documented the delivery of this Notice to you. Receipt of this Notice will be taken into consideration, should you continue to be involved in any criminal activities described above. If you wish to discuss this Notice and its contents further, please contact the undersigned Special Agent who served you with this Warning Notice or the local OPR field office.

*Id.* (emphasis in original). The notice then provided a place for Mr. Streever to acknowledge receipt, which he did not do because he was not there. *Id.*; *id.* ¶ 78.

Unable to find Mr. Streever in Rochester, Agent Henry, now joined by Special Agent Trevor Pitts, tried to speak with Mr. Streever at a hotel in New York City on his return journey from Europe. *See id.* ¶¶ 90–93; Goodwin Decl. ¶¶ 11–12. It appears that the agents were unable to meet with Mr. Streever that night, or indeed at any point thereafter. The agents called Mr. Streever twice, but they never spoke with him. *See* Compl. ¶ 95; Goodwin Decl. ¶ 12.

At the end of the month, Agent Henry "wrote a report of investigation to serve as a closing report summarizing the investigation." Goodwin Decl. ¶ 13. "With its investigation

closed," OPR represents that it "does not contemplate any further investigation into Mr. Streever regarding his January 2026 email to Lyons." *Id.* ¶ 15.

But no one told Mr. Streever that the investigation was closed. Assuming he was still under investigation, Mr. Streever sued Defendants on July 6, 2026. *See* Compl. at 25. The organization representing Mr. Streever then posted on social media touting Mr. Streever's lawsuit. Homeland Security (@DHSgov), X (July 6, 2026, 3:06 p.m.).[3] A DHS social-media account responded, explaining that "ICE investigates all credible threats towards its employees and officers, including threats to the ICE Director. As a matter of policy, we do not comment on any ongoing investigations." *Id.* The post closed by emphasizing that "ANYONE who assaults or threatens our law enforcement officers will face the consequences." *Id.* A DHS spokesperson gave the same answer to a reporter for National Public Radio, although without the threat of future consequences. *See* Jude Joffe-Block, *He Sent a Harsh Email to ICE's Top Official. 5 Months Later, Federal Agents Tracked Him Down*, NPR (July 1, 2026, at 5:00 ET).[4]

## III. ANALYSIS

There are two motions before the Court. Mr. Streever asks for a preliminary injunction, while Defendants move to dismiss or transfer. The Court addresses, and denies, the motion to dismiss or transfer before it considers, and partially grants, the motion for a preliminary injunction.[5]

[3] Available at x.com/DHSgov/status/2074208454974267678 [https://perma.cc/GN39-352E] (last visited Sep. 1, 2026).

[4] Available at www.npr.org/2026/07/01/nx-s1-5874124/dhs-tracks-ice-critic [https://perma.cc/Y3RH-3QJ5] (last visited Sep. 1, 2026).

[5] Mr. Streever initially requested a hearing on his motion. Pl.'s Mot. Prelim. Inj. at 1, ECF No. 9. But in an email to the Court on August 20, 2026, he withdrew that request in the hopes that it would yield a faster resolution of his motion. Defendants gave no indicational that they wished for a hearing.

### A. Venue

The Court starts with venue. *See Chevron U.S.A. Inc. v. Env't Prot. Agency*, 45 F.4th 380, 385 (D.C. Cir. 2022) (holding that courts may consider venue before other threshold issues, including jurisdictional ones). Defendants' venue motion involves two distinct parts. First, Defendants argue that the Court *must* dismiss or transfer Mr. Streever's case because the District of Columbia is not a permissible venue. That argument is governed by 28 U.S.C. § 1391(e), which prescribes the permissible venues for "[a]ctions where [the] defendant is [an] officer or employee of the United States."

Second, Defendants argue that even if venue is proper in this District, the Court *should* still transfer the case to the Western District of New York because that is the more appropriate venue. That argument is controlled by 28 U.S.C. § 1404(a), which states that "a district court *may* transfer any civil action" "[f]or the convenience of parties and witnesses, in the interest of justice." (emphasis added).

#### 1. Venue Under 28 U.S.C. § 1391

Venue is appropriate here because at least one federal defendant resides in the District of Columbia. The general federal venue statute provides venue for suits against "officer[s] or employee[s] of the United States" in, among other places, "any judicial district in which . . . a defendant in the action resides." 28 U.S.C. § 1391(e)(1). As Mr. Streever points out, and Defendants do not contest, Defendants Mullin, Venturella, and Fenton all reside within this District for purposes of venue. *See* Pl.'s Opp'n to Defs.' Combined Mot. Dismiss & Transfer ("Pl.'s Opp'n") at 3, ECF No. 19; *Lamont v. Haig*, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978) (holding residence of "federal defendants" determined for purposes of venue by their "official residence . . . where the official duties are performed").

Defendants argue that Section 1391 does not mean what it says. Relying on the D.C. Circuit's decision in *Cameron v. Thornburgh*, 983 F.2d 253 (D.C. Cir. 1993), they argue that Mr. Streever has attempted to "manufacture" venue in the District and that naming high-ranking government officials is not enough to secure venue. Defs.' Mot. at 7 (quoting *Cameron*, 983 F.2d at 256).

As Plaintiffs point out, however, *Cameron* confirms that Section 1391(e) confers venue in the District of Columbia where, as here, the plaintiff names a high-ranking government official residing in the District as a defendant. The D.C. Circuit explained that "Section 1391(e) makes venue proper for a suit against government officials in any district in which one defendant resides. Because Attorney General Thornburgh lived in the District of Columbia, the court correctly concluded that venue would have been proper in this district for the injunctive claim." *Cameron*, 983 F.2d at 256 n.2 (emphasis removed). The only reason that ultimately did not suffice in *Cameron* was because the injunctive claim was moot. *Id.* at 257. The court went on to explain that the remaining claims were not claims against officers in their official capacity; therefore Section 1391(e) did not apply, and the plaintiff "could not fit his claim under the general venue provisions for federal question cases set out in 28 U.S.C. § 1391(b)." *Id.* at 256–57

Here, Mr. Streever seeks injunctive relief against three government officials in their official capacity who reside in this District. And unlike in *Cameron*, that claim for injunctive relief is not moot. *Cameron* therefore confirms that venue is proper under 28 U.S.C. § 1391(e)(1). *See Cameron*, 983 F.2d at 256 n.2.

To be sure, the court in *Cameron* advised that "[c]ourts in this circuit must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff

might manufacture venue in the District of Columbia." *Id.* at 256. Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere." *Id.*

But the Court does not understand the D.C. Circuit to have dispensed with the clear text of Section 1391(e)(1) through this admonition. Instead, courts in this district heed the Circuit's warning through a careful analysis of discretionary transfer under Section 1404(a). *See, e.g.*, *Simpson v. Fed. Bureau of Prisons*, No. 1:19-CV-03173 (CJN), 2020 WL 95814, at *4 (D.D.C. Jan. 8, 2020) (finding venue proper in D.C. but nonetheless citing *Cameron* and transferring the case under Section 1404(a)). Indeed, *every* case Defendants cite as purportedly having "rejected Streever's attempt to distinguish *Cameron*," discusses *Cameron* while analyzing discretionary transfer under Section 1404(a), not proper venue under Section 1391, with one expressly rejecting its application to Section 1391. Defs.' Reply in Supp. Mot. Dismiss or Transfer ("Defs.' Reply") at 5–6, ECF No. 21; *see Abusadeh v. Chertoff*, No. CIV.A.06 2014 CKK, 2007 WL 2111036, at *5 (D.D.C. July 23, 2007) ("The principle that Defendants advocate is an important one. However, it is one ordinarily considered by courts in determining whether to transfer an action pursuant to 28 U.S.C. § 1404(a), and not the sole principle relied upon in finding a lack of venue in the District of Columbia . . . ."); *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 81 (D.D.C. 2009); *Bourdon v. U.S. Dep't of Homeland Sec'y*, 235 F. Supp. 3d 298, 304, 306 (D.D.C. 2017).[6]

[6] The Court is aware of at least one case in this District where a court has applied *Cameron* to the question of whether venue is proper in the way Defendants advocate. *See Su v. U.S. Dep't of Just.*, No. 1:25-CV-03412 (TNM), 2026 WL 904997, at *3 (D.D.C. Apr. 2, 2026). For the reasons explained above, and in line with most cases in this district, this Court respectfully disagrees with that analysis.

**2. Transfer Under 28 U.S.C. § 1404(a)**

Having concluded that venue in the District of Columbia is permissible, the Court now considers whether it should nonetheless transfer the case to the Western District of New York under 28 U.S.C. § 1404(a). "The district court has discretion to adjudicate motions to transfer according to an 'individualized case-by-case consideration of convenience and fairness.'" *Chauhan v. Napolitano*, 746 F. Supp. 2d 99, 102 (D.D.C. 2010) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). The first step in this analysis is to determine whether venue would also be permissible in the Western District of New York. *See Porfirio v. Mullin*, No. CV 25-4055 (RC), 2026 WL 2123251, at *2 (D.D.C. July 23, 2026). The parties appear to agree, however, that it is—which makes sense because Mr. Streever is a resident there. *See* 28 U.S.C. § 1391(e)(1) (allowing venue where "the plaintiff resides").

Next, the court must balance a series of private- and public-interest factors. *See Chauhan*, 746 F. Supp. 2d at 103. The private-interest factors generally include (1) the parties' choices of forum, (2) the district where the claims arose, (3) the convenience of the parties, (4) the convenience of witnesses, and (4) the ease of access to proof. *See id.* at 102. The public-interest factors encompass "(1) the transferee court's familiarity with the applicable law; (2) the relative congestion of the calendars of the transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Porfirio*, 2026 WL 2123251, at *3. The Court addresses the factors in turn.

*a. The parties' choice of forum*

The parties' respective choices of forum favor venue in the District of Columbia. "[F]ederal courts have developed a bewildering variety of verbal formulations to describe the weight to be accorded the plaintiff's initial choice of forum in transfer motions." 8 *Wright &*

*Miller's Federal Practice & Procedure* ("*Wright & Miller*") § 3848 (4th ed.). In this District, courts have said that they afford plaintiff's choice of forum "substantial deference" over the defendant's choice and treat it as a "paramount consideration." *Defs. of Wildlife v. Salazar*, No. CV 12-1833 (ABJ), 2013 WL 12316872, at *3 (D.D.C. Apr. 11, 2013) (quotations omitted). The Supreme Court, for its part, has described it not as deference but as "plaintiff's venue privilege." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (quotation omitted).

Whatever the articulation, as with most things in life, "context is important." *Wright & Miller* § 3848. The deference afforded a plaintiff is diminished where, as here, the plaintiff sues outside his home forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981); *Pac. Mar. Ass'n v. N.L.R.B.*, 905 F. Supp. 2d 55, 60 (D.D.C. 2012). But it still retains some force. "Even if the plaintiff resides outside of the forum, [ ] courts have understood the Supreme Court's reasoning to instruct that they give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons . . . ." *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 949–50 (D.C. Cir. 2019) (cleaned up). Deference to the plaintiff's choice is therefore minimized only if it is both outside his home and there is "no meaningful connection to or interest in the controversy" in the forum the plaintiff chose. *Amalgamated Transit Union, Int'l v. U.S. Dep't of Lab.*, 832 F. Supp. 3d 78, 83 (D.D.C. 2026) (quoting *Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2, 5 (D.D.C. 2013)). Requiring at least a meaningful connection to the chosen forum is part of how courts give effect to the D.C. Circuit's warning in *Cameron* to guard against manufactured venue. *See* 983 F.2d at 256.

Here, Mr. Streever's choice receives deference because the Court cannot conclude that the case bears no meaningful connection to the District of Columbia. The incipient event for this

case was a message sent to Acting Director Lyons, who resides in the District of Columbia. That message was not a generalized petition or request made to an agency, which might have been processed anywhere. *Cf., e.g.*, *Porfirio*, 2026 WL 2123251, at *3 (transferring case involving visa petition that was ultimately processed in Texas). It was a personalized message sent to Acting Director Lyons, albeit regarding conduct undertaken in his official capacity, with language that spoke to the Acting Director as an individual. *See, e.g.*, Compl., Ex. 1 ("Even Trump will turn on *you* before the end, and *you* will be a sad, despised *man* who eats *himself* alive with shame at *your own* pathetic weakness." (emphases added)). Defendants' reaction to that message, and their apparent desire to protect Acting Director Lyons, a D.C. resident, sparked this case.

That the event which spawned this litigation has a strong connection to this district is no trifling consideration. True, that message was sent *from* the Western District of New York, and other important events occurred there as well, such as the officers arriving at Mr. Streever's home and issuing the Warning Notice. But for purposes of determining whether Mr. Streever's choice of forum is entitled to deference over Defendant's preference, the question is not whether the case has the strongest connection to the District of Columbia, only whether it has a meaningful one. It does. The Court therefore finds that the parties' choices of forum weigh against transfer, but not with the full weight of the deference ordinarily afforded a plaintiff suing in his home forum.[7]

[7] Some courts separately analyze and afford deference to the plaintiff's and defendant's choice of forum, and this Court has done so in the past. *See, e.g.*, *Ctr. for Bio. Diversity v. Bernhardt*, No. 20-CV-00855 (APM), 2020 WL 12674077, at *1 (D.D.C. Nov. 28, 2020). The Court finds this framing unilluminating given that, faced with a motion to transfer, the parties have necessarily chosen different fora. It is counterintuitive to simultaneously defer to both the plaintiff's and the defendant's conflicting choices. Moreover, whether a defendant's choice of forum receives any deference turns on the degree of deference afforded to the plaintiff and

*b. Where the claims arose*

On the other hand, consideration of where Mr. Streever's claims arose slightly favors transfer. As Defendants point out, Mr. Streever presumably sent the email from his home in the Western District of New York, and federal agents delivered the warning notice to his home in that district.

Even so, many events occurred elsewhere. To start, as discussed above, Mr. Streever's message was directed at and received in the District of Columbia. Afterward, DHS made an initial determination that Mr. Streever's "email had potential threatening undertones to ICE personnel, potentially presenting a safety concern." Goodwin Decl. ¶ 7. It is not clear who made this critical decision, or where that person was, but there is no indication it was in the Western District of New York. Whoever made the decision then forwarded the email to OPR, which is based in the District of Columbia. *Id.* The case was then given to Agent Henry, who worked alongside Agent Brodie, both in the District of New Jersey. *Id.* ¶¶ 7–8.

Eventually, "OPR determined that it needed to conduct an ICE investigation." *Id.* ¶ 7. Once again, it is unclear exactly where that decision was made—by the agents in New Jersey, at OPR's office in the District of Columbia, or at the field office in Virginia—but whichever way,

whether "the added convenience and justice of litigating in [the defendant's] chosen forum overcomes the deference given to the plaintiff's forum choice." *Amalgamated Transit Union*, 832 F. Supp. 3d at 83 (cleaned up). That analysis is therefore both derivative of the analysis for deference to the plaintiff's forum and duplicative of the analysis of the remaining factors, such as, convenience to the parties and witnesses and the interests of justice. The Court therefore focuses its analysis on the *relative* deference afforded to either plaintiff or defendant's choice of forum—in other words, who actually gets deference. At any rate, the difference is semantic because the Court still considers all the factors analyzed by others (whether the plaintiff sued in their own forum, the connection of the suit to the chosen forum, and the convenience of the parties, etc.).

the decision was *not* made in the Western District of New York where OPR has no office.[8] Even after the trip to Mr. Streever's home in the Western District of New York, the federal agents followed Mr. Streever to his hotel in the Southern District of New York. Compl. ¶ 8

Taken together, most of the relevant events did not occur in the Western District of New York, but a plurality of the events did. The Court therefore finds that the Western District of New York has a slightly stronger nexus to the claims, but not enough to tip heavily in favor of transfer. *See Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 102 (D.D.C. 2009) ("When the events occur in more than one district, a court can consider which jurisdiction has the stronger factual nexus to the claims.").

Mr. Streever counters that the events primarily arose in Washington, D.C., because the "lawsuit challenges agency-level decision-making and continuing conduct." Pl.'s Opp'n at 13; *see also id.* at 3 ("Th[e] campaign could emanate only from DHS's command in this district."). Mr. Streever, however, has not alleged that any of the D.C. Defendants, or agents in the District, participated themselves in the decision to investigate his email.

*c. Convenience of the parties*

Turning to the convenience of the parties, the Court concludes that this factor militates against transfer. The convenience of Mr. Streever favors transfer because he resides in the Western District of New York, and a "plaintiff cannot reasonably claim to be inconvenienced by litigating in his home forum." *Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 333 (D.D.C. 2020) (cleaned up). Ironically, however, he is the *only* party (out of eight) for whom

---

[8] *See* ICE Field Offs., ICE, https://www.ice.gov/contact/field-offices?state=All&office=13&keyword= [https://perma.cc/E6W7-686R] (last visited Sep. 1, 2026). "The Court may take judicial notice of information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022).

litigation in the Western District of New York would be more convenient. As Mr. Streever emphasizes, three Defendants reside in the District of Columbia, although the Court assigns less weight to the residence of high-ranking agency officials because they are unlikely to testify at trial or sit for a deposition. *See Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985) ("[T]op executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.").

Defendants insist that the convenience of the other parties' favor transfer because the parties in New Jersey and New York City "reside far closer to the Western District of New York than" the District of Columbia. Defs.' Reply at 4. Despite their apparent affinity for New York, however, Defendants appear to underestimate the state's size. The Court may take judicial notice of the fact that the District of Columbia is over a hundred miles closer to New York City and New Jersey than the federal courthouses in the Western District of New York (in Buffalo and Rochester), and unsurprisingly the travel time by car to the District of Columbia is much shorter. *Richard v. Bell Atl. Corp.*, 209 F. Supp. 2d 23, 27 n.2 (D.D.C. 2002) ("The court has the authority to take judicial notice of information contained within the public domain, such as the distance between two locations."). It would therefore be more convenient for even these Defendants to litigate in the District of Columbia.

It is not lost on the Court that both parties seek to litigate in fora that appear to be less convenient for them. Nonetheless, because two play at that game, the Court is left to weigh where on balance would be convenient for most parties. Accordingly, this factor militates against transfer.[9]

---

[9] Some courts have reasoned that a plaintiff cannot be considered inconvenienced by litigation in their chosen forum, even if it is not their home forum. *See Wright & Miller* § 3849 ("That the plaintiff may suffer some inconvenience in the district it chose is not an argument that

*d. Convenience of the witnesses*

Convenience to the witnesses holds little sway in this case. The parties agree that this factor "matters 'only to the extent the witnesses may actually be unavailable for trial in one of the fora.'" Pl.'s Opp'n at 14, (quoting *Ctr. for Env't Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 357 (D.D.C. 2014)); Defs.' Mot. at 11, 16 (similar). Many courts have said as much, but count this one skeptical. The statute instructs courts to consider "the convenience of parties and witnesses" without imposing any such qualification. 28 U.S.C. § 1404(a); *see also Atl. Marine Const. Co.*, 571 U.S. at 63 n.6 ("[P]rivate interests include . . . [the] 'availability of compulsory process for attendance of unwilling, *and the cost of obtaining attendance of willing*, witnesses . . . .'" (emphasis added) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)); *Wright & Miller* § 3851 ("Courts may also take into account . . . the cost to 'willing witnesses' of attending trial in a particular forum."). Although if a witness would be unavailable in a particular forum, that presumably matters more. *See Wright & Miller* § 3851 ("[T]he fact that important nonparty witnesses may be within the subpoena power of one court but not the other is a significant issue."). Nonetheless, because the parties agree that the Court should only consider those who may actually be unavailable, as a matter of discretion, the Court will not challenge their consensus and deems any argument that available

---

a defendant can make successfully in support of its transfer motion."). That same logic might extend to defendants as well, who could be assumed to find their preferred location convenient. If that were the case, then the Court would be required to presume the Western District of New York convenient for all Defendants and the District of Columbia convenient for only Mr. Streever, in which case this factor would come out the opposite way. Neither party has made this argument, however, so the Court considers it forfeited. *See Morrissey v. Mayorkas*, 17 F.4th 1150, 1158 (D.C. Cir. 2021). Furthermore, the Court wonders whether this approach simply repeats consideration of deference to the parties' respective choice of forum.

witnesses would be inconvenienced forfeited. *See Morrissey v. Mayorkas*, 17 F.4th 1150, 1158 (D.C. Cir. 2021).

Defendants identify four sets of unavailable witnesses. They point to "neighbors, who may have seen the agents visit [the Streever's] house" and a "Syracuse resident" who allegedly also received a warning notice. Defs.' Mot. at 16; *see* Compl. ¶¶ 100–01. (Syracuse is within 100 miles of the Western District of New York courthouse in Rochester, but not Buffalo.) Defendants also identify Ms. Streever, who resides in Rochester, and "other witnesses to those events in New York." Defs. Mot. at 16.

None of these witnesses favors transfer. Starting with potential neighbors, there is no evidence that any neighbors saw the agents visit to the Streever's residence, and given that there is camera footage of the visit, they would have needed to be within earshot to add much value through corroboration of the conversation. Compl. ¶¶ 72–73. Thus, whether either party would call such witnesses is, as Mr. Streever puts it, "purely speculative." Pl.'s Opp'n at 14. For the Syracuse resident, Defendant say only that "*Plaintiff* may offer this Syracuse resident as a witness . . . ." Defs.' Mot. at 16. Mr. Streever, for his part, appears ambivalent about calling the Syracuse resident, describing her testimony as "cumulative of [his] wife's testimony." Pl.'s Opp'n at 14. It is therefore also speculative that she will be called to testify. And Defendants' invocation of unnamed "other witnesses" in New York is too vague to count. *See Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1164 (S.D. Fla. 2017) (finding that a party's "speculation regarding their 'potential witnesses' is not entitled to any weight"). That leaves Ms. Streever, and the Court is hard pressed to conclude that she would not be willing to testify at trial in support of her husband who chose the District of Columbia as his forum. It is unlikely that

Defendants would call her to testify because they themselves can testify to what happened in Rochester. The Court therefore finds that this factor does not move the needle.

*e. Access to the evidence*

The parties identify no evidence that would be easier to use in either district. Defendants suggest that because the case arose "primarily" in the Western District of New York that "District likely will be more convenient for potential witnesses and evidence." Defs.' Mot. at 16 (quoting *McAfee, LLC v. U.S. Citizenship & Immigr. Servs.*, No. 19-cv-2981 (DLF), 2019 WL 6051559, at *2 (D.D.C. Nov. 15, 2019)). The Court has already addressed witnesses. As for other evidence, although *McAfee*'s presumption may be a good rule of thumb, Defendants identify no particular evidence that would be in Rochester. And given the agents' fleeting excursion there, it is unlikely that significant relevant evidence lies there. Mr. Streever, meanwhile, argues that "notice templates, investigate records, supervisory communications, records showing how agents located Streever, and DHS's public-response materials" are "electronic" records within Defendants' control and not in Rochester. Pl.'s Opp'n at 15. Maybe so, but given his acknowledgment that the evidence is electronic, and thus easily transportable, that does not favor venue in the District of Columbia either. *See Wolfram*, 490 F. Supp. 3d at 333–34 ("The weight of the location of evidence is limited by modern technology that allows most documentary evidence to be easily transferred and therefore the location of documents is less important than it once was." (cleaned up)).

*f. Public-interest factors*

Most of the public interest factors are neutral. The parties agree that familiarity with applicable law is neutral because the case presents only issues of federal law. Defs.' Mot. at 17; Pl.'s Opp'n at 15.

The Court also concludes that the "perhaps most important" public-interest factor—a forum's interest in deciding local issues—is neutral, over both parties' objection. *Wolfram*, 490 F. Supp. 3d at 338. Defendants cast this case as a local affair confined to New York. Defs. Mot. at 18. On the other end of the spectrum, Mr. Streever boasts of a case with national importance. Pl.'s Opp'n at 16–17. The Court finds that the case falls between these two extremes.

The parties represent different interests in this case. Mr. Streever sues because he wants to vindicate his rights to free speech and to petition his government. *See* Compl. ¶¶ 1–2, 13–14. Defendants resist in an effort to protect the ability of law enforcement to investigate and deter criminal threats or crimes that follow less-than-criminal threats. Defs.' Opp'n Pl.'s Mot. Prelim. Inj. ("Defs.' Opp'n) at 1, ECF No. 20.

Those interests apply to both fora. No doubt, the Western District of New York has an interest in safeguarding its residents' right to speak freely and an interest in deterring its residents from engaging in unlawful activity such as uttering criminal threats. *See Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted." (quotation omitted)); *cf. Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018) (recognizing that anti-SLAPP laws represent a jurisdiction's interest in protecting residents' exercise of free speech). At the same time, the District of Columbia retains an interest in ensuring its residents hear political speech and that law enforcement can protect residents from criminal threats and deter even non-criminal threats from developing into criminal acts through investigations. *See Schall*, 467 U.S. at 264; *cf. Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490, 1498 (D.D.C. 1987) (finding, as part of a conflicts-of-law analysis, that the state where allegedly false speech was *received* retained "a greater interest in protecting free speech").

The Court is therefore unpersuaded by both parties' positions. Because of the nature of cross-border communications, the Court cannot agree with Defendants that this is a purely local dispute where the communication was made. *Cf. United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) ("In considering challenges to venue for other criminal acts, we have held that venue lies both in the district where a telephonic communication in furtherance of a crime was made and where it was received.") (collecting cases). Nor can the Court agree that this case is the national dispute that Mr. Streever makes it out to be because Mr. Streever is not asking the Court to set aside any national policy. *See* Compl. at 24–25 (Prayer for Relief). Rather, the case's effects are primarily felt in two fora—New York and the District of Columbia. So this factor is neutral.

That leaves only relative court congestion. The parties agree on the facts. *Compare* Defs.' Mot. at 17–18, *with* Pl.'s Opp'n at 16. The Western District of New York has about half the case load of the District of Columbia, but, because it has far fewer judges, it has more cases per judge, and the cases generally take longer to resolve. *See* Pl.'s Opp'n at 16. The Court therefore agrees with Mr. Streever that this factor favors retaining the case here, but it matters only a little.

*g. Weighing the factors*

In the final analysis, the Court finds that transfer is unwarranted. Weighing the competing factors is no easy task. *See Ford Motor Co.*, 182 F.2d 329, 321–22 (2d Cir. 1950) (opining, in the context of venue transfer under Section 1404(a), that "[a]t best, the judge must guess, and we should accept his guess unless it is too wild").

In this case, the factors point in different directions, favor a given party to different degrees, and carry differing weights. Mr. Streever's choice enjoys some, but not much,

deference. Both fora have meaningful connections to the case, but the Western District of New York has a slightly stronger nexus. The parties are closer to the District of Columbia (though all wish to litigate far away) and courts here are a bit less congested. The Court is further mindful that Defendants bear the burden of convincing the Court that "transfer is proper." *Rossville Convenience & Gas, Inc. v. Barr*, 453 F. Supp. 3d 380, 385 (D.D.C. 2020). The Court concludes that on this record, Defendants have not met that burden, so it will deny Defendants' motion to transfer.

**B. Preliminary Injunction**

Having addressed Defendants' venue motion, the Court now turns to Mr. Streever's motion for a preliminary injunction. Obtaining a preliminary injunction "requires a plaintiff to make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The balance of the equities and the public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The first two factors," likelihood of success on the merits and irreparable harm, "are the most critical." *Id.* at 434. The plaintiff must also make a "clear showing" that he "is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). The Court begins with the threshold issue of standing before delving into each of the preliminary-injunction factors.[10]

---

[10] Defendants imply that, because Mr. Streever seeks interim relief, the Court could skip over standing if it finds that Mr. Streever is unlikely to succeed on the merits. *See* Defs.' Opp'n at 10. As this Court has said before, it "remains as unsettled as ever" whether courts must

**1. Standing**

To have standing for a preliminary injunction, a plaintiff must clearly show that he "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The relevant factor here is the requirement of a concrete injury. Because Mr. Streever seeks "injunctive relief," a form of forward-looking relief, he "must show he is suffering an ongoing injury or faces an immediate threat of injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Past injuries alone will not suffice. *Id.* Applying this standard, the Court finds that Mr. Streever lacks standing to challenge the investigation into his January email but maintains standing to challenge the Warning Notice.

*a. The Investigation*

Mr. Streever lacks standing to seek an injunction for the investigation into his January email. Generally, a plaintiff cannot seek an injunction against an investigation that is already closed because they suffer no continuing injury. *See Comm. in Solidarity with the People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991) (explaining that the "[p]laintiffs'

consider jurisdictional issues before the preliminary-injunction factors or whether jurisdiction is simply one aspect of likelihood of success on the merits that courts may skip over if they would otherwise deny relief. *Advocs. for Hum. Rts. v. Blanche*, No. CV 26-865 (RC), 2026 WL 2607203, at *7 n.8 (D.D.C. Sep. 3, 2026). *Compare Mullin v. Doe*, 146 S. Ct. 2121, 2137 (2026) (plurality opinion) ("[C]ourts need not always start with the jurisdictional ground if the claim for interim relief would also fail on the merits."), *with Murthy*, 603 U.S. at 56 (holding, in the context of a preliminary injunction, that the plaintiffs likely lacked standing and therefore the Court "lack[ed] jurisdiction to reach the merits of the dispute"). As before, "[t]he Court addresses standing first, without deciding whether it is bound to do so." *Advocs. for Hum. Rts. v. Blanche*, No. CV 26-865 (RC), 2026 WL 1162794, at *7 n.12 (D.D.C. Apr. 29, 2026).

challenge to the constitutionality of the FBI's investigation could not alone satisfy" Article III's requirements because "[t]he investigation ended years ago").

Here, Mr. Streever can establish neither a current nor future injury. Assistant Director Goodwin explained in his declaration that Agent Henry submitted a report that she intended to serve as a report closing the investigation into Mr. Streever on June 30, 2026. Goodwin Decl. ¶ 14. Because the investigation closed, Mr. Streever lacks a current injury.

Nor is there future harm because Assistant Director Goodwin reports that "[w]ith its investigation closed, ICE OPR does not contemplate any further investigation in Mr. Streever regarding his January 2026 email to Lyons." *Id.* ¶ 15. Mr. Streever offers no persuasive evidence to clearly show that ICE OPR will reopen its investigation into the January 2026 email in the imminent future. Although Mr. Streever suggests that Defendants might open new investigations if he speaks out against them, those would presumably not be investigations into the January 2026 email but rather into his subsequent criticism. Mr. Streever therefore fails to establish a future injury as well. *Cf. Zieper v. Reno*, 111 F. Supp. 2d 484, 489 (D.N.J. 2000) ("For the declaratory and injunctive relief plaintiffs seek regarding the Film, they cannot establish a credible threat of future harm. The investigation of the Film by defendants has ended, and defendants do not intend to initiate any prosecution with regard to the Film.").

Mr. Streever insists that the investigation has not been closed because, after purportedly closing the investigation, DHS issued a statement on social media implying that the case remained open. Reply Mem. Supp. Mot. Prelim. Inj. at 9, ECF No. 22. In response to a post by the organization representing Mr. Streever, DHS wrote that "ICE investigates all credible threats towards its employee officers, including threats to the ICE Director" and added that "[a]s a matter of policy, [DHS] do[es] not comment on any ongoing investigations." Homeland

Security (@DHSgov), X (July 6, 2026, at 3:06 p.m.).[11] In the context of a response to a post about Mr. Streever, and with the express reference to a threat against Acting Director Lyons, Mr. Streever understandably assumed this meant the investigation into his January email remained open.

Despite the somewhat contradictory statement on the DHS social-media account, the Court finds Assistant Director Goodwin's sworn statement that Agent Henry submitted what was intended to be a closing report on June 30, 2026, credible. Assistant Director Goodwin does not vaguely declare that the investigation is over. He swears that he reviewed a specific "report of investigation" written by Agent Henry. Goodwin Decl. ¶ 13. He also specifies some of the contents of that report, explaining that it "stated . . . that OPR Jersey City had exhausted all investigative leads and that the case is closed." *Id.* ¶ 14. Because Assistant Director Goodwin relies on an identified piece of contemporaneous documentation that he claims corroborates his account—a document that may come to light during discovery or as part of the administrative record—the Court has little reason to doubt his account. Mr. Streever therefore cannot establish standing to challenge the now-closed investigation.

That said, the Court finds the language in the declaration somewhat opaque. Assistant Director Goodwin says that Agent Henry "wrote a report of the investigation *to serve as* a closing report." *Id.* ¶ 13 (emphasis added). It is not entirely clear that the report immediately closed the investigation. Closing an investigation may have required supervisor approval, coming after Agent Henry's report. Because it is Mr. Streever's burden to make a clear showing that he is likely to establish standing, this does not change the Court's conclusion that he lacks

---

[11] Available at x.com/DHSgov/status/2074208454974267678 [https://perma.cc/GN39-352E] (last visited Sep. 1, 2026).

standing regarding the past investigation. *See Murthy*, 603 U.S. at 58. At this stage, the Court makes only a predictive judgment of standing, not a final determination. But because this case will continue in any event, the Court will order Defendants to provide to the Court, *in camera*, the report and any documentation evidencing supervisory approval or official documentation closing the investigation.[12]

*b. The Warning Notice*

The Warning Notice is a different matter. Defendants have not disavowed the Warning Notice, nor do they deny that it remains in effect. The Warning Notice therefore provides a continuing injury over which Mr. Streever has standing to sue.

The Supreme Court has recognized that when the government directly threatens a party with future enforcement actions targeting their First Amendment activity, it creates an on-going injury at least where there is a "distinct possibility of" enforcement. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 193 (2026). *First Choice* involved a subpoena issued by the New Jersey Attorney General seeking the identities of a nonprofit's (First Choice's) donors. *Id.* at 178. The Attorney General argued that the subpoena was not self-executing, meaning a court had to subsequently enforce it, so a recipient "suffers no injury unless and until a court

[12] The parties also discuss the closure of the investigation "through the lens of mootness." *Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025). Mootness, rather than standing, is typically the correct framework when a defendant voluntarily ceases challenged conduct. *See, e.g.*, *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024). That is because "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added). If a defendant ends the challenged conduct after the plaintiff sues, that goes to mootness rather than standing. *See Doe*, 128 F.4th at 385; *see also Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam). This matters because mootness flips the burden to the defendant to prove that the case is moot, rather than to the plaintiff who must establish standing. *See Fikre*, 601 U.S. at 241. In this case, however, it appears that the investigation ended, or at least was in the process of ending, *before* Mr. Streever sued. Standing is therefore an appropriate lens through which to view this Court's jurisdiction.

enforces it." *Id.* at 192. The Supreme Court disagreed. The subpoena "commanded First Choice to produce private donor information" and "warned that failure to comply may render the group liable for Contempt of court." *Id.* at 192–93 (cleaned up). The Court reasoned that regardless of "[w]hether that command and those penalties were immediately enforceable or depended on subsequent court action . . . [o]bjectively reasonable people interested both in their privacy and in associating with First Choice would 'not lightly disregard' such a distinct possibility of disclosure." *Id.* at 193 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963)).[13]

Mr. Streever likewise faces a distinct possibility of prosecution for future speech. The Warning Notice requests that Mr. Streever "discontinue" his political speech and threatens prosecution, if he does not. Although the Warning Notice is not self-enforcing and does not guarantee that prosecution will follow, neither was the subpoena in *First Choice*. The subpoena in *First Choice* only threatened that "failure to comply '*may* render the group liable for Contempt of court." *Id.* at 193 (cleaned up) (emphasis added). As in *First Choice*, an objectively reasonable person in Mr. Streever's shoes "would 'not lightly disregard' such a distinct possibility of" prosecution. *Id.* (quoting *Bantam Books*, 372 U.S. at 68). And Mr. Streever alleges that he has been "induced, as well, to trim [his] protected advocacy knowing [he] now stands in the government's crosshairs." *Id.*; *see* Compl. ¶ 110.

[13] The general standard for a pre-enforcement suit is that the plaintiff face "a credible threat of enforcement." *See id.* at 183 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014)). As the Supreme Court explained in *First Choice*, however, it did not address such a future injury but rather found, as First Choice argued, that the subpoena caused First Choice "to suffer an actual and on-going injury to its First Amendment rights by deterring donors from associating with it," and argument that was "enough to carry the day." *Id.* at 184 It is in this context, where a direct threat has been made against the plaintiff, as it has here, that the distinct-possibility standard applies.

Even if the Warning Notice were not explicit enough, a DHS spokesperson later posted on social media, *in response to a post about Mr. Streever's lawsuit*, specifically referencing a purported "credible threat towards . . . the ICE Director" and warned that "ANYONE who assaults or threatens our law enforcement officers will face the consequences." Homeland Security (@DHSgov), X (July 6, 2026, at 3:06 p.m.).[14] This public statement and the reference to "consequences" further underscores that Mr. Streever faces a credible threat of government reprisal.

Defendants dismiss the Warning Notice as merely a reminder to Mr. Streever "not to violate federal law" and argue it represents at most a past injury. Defs.' Opp'n at 19. The Warning Notice, however, is not quite so innocuous. In the opening paragraph, it identifies Mr. Streever's January email and states that OPR "has reason to believe [it] may constitute a violation of Title 18 of the U.S. Code." Compl., Ex. 2. It then requests that Mr. Streever "promptly remove and/or discontinue the *aforementioned behavior*." *Id.* (emphasis added). Defendants seem to understand "aforementioned behavior" to refer to criminal threats generally. But because of the immediately preceding reference to Mr. Streever's email to Acting Director Lyons, this request is fairly read as a demand that Mr. Streever refrain from criticizing Acting Director Lyons.

The notice also warns Mr. Streever of the potential for prosecution. After describing Mr. Streever's email as a potential "violation of Title 18," the notice goes on to describe various crimes under that title and remind Mr. Streever that "[v]iolations of these or related laws could subject you to both federal and state prosecution." *Id.* (emphasis removed). If that were not

[14] Available at x.com/DHSgov/status/2074208454974267678 [https://perma.cc/GN39-352E] (last visited Sep. 1, 2026).

enough, the letter closes by telling Mr. Streever that "[r]eceipt of this Notice will be taken into consideration, should you *continue* to be involved in any criminal activities described above." *Id.* The use of "continue" implies that Mr. Streever's email already exposed him to criminal liability and, critically, that any similar speech by Mr. Streever in the future will be viewed the same way.

All told, the Warning Notice demands that Mr. Streever "discontinue" his political speech criticizing Acting Director Lyons. It does so while reminding Mr. Streever of the risk of prosecution and warning him that if he "continue[s]" to criticize Acting Director Lyons and ICE, the fact that he has been warned for his past speech "will be taken into consideration," implying future prosecutions. Political speech is not a crime, so that is hardly a reminder to follow the law. And because the Warning Notice speaks of "discontinu[ing]" Mr. Streever's political speech and threatens consequences if he "continue[s]" to speak out, it represents a continuing, rather than a past, injury.[15]

Unable to dismiss the Warning Notice, Defendants argue that Mr. Streever's future injury is too speculative and contend that this case is analogous to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). *See* Defs.' Opp'n at 13–14, 16–17. *Lyons* dealt with a plaintiff seeking a preliminary injunction barring law enforcement from using an illegal chokehold technique that had been used on him in the past. 461 U.S. at 99–100, 105. The Supreme Court held that Mr. Lyons lacked standing because his future injury relied on a series of assumptions about what

[15] For the same reason, the Court rejects Defendants' argument that Mr. Streever suffers no injury because the "alleged suppression campaign 'had considerably subsided' by the time" Mr. Streever sued. Defs.' Opp'n at 18 (quoting *Reading v. N. Hanover Twp., New Jersey*, 124 F.4th 189, 197 (3d Cir. 2024); *see also Advocs. for Hum. Rts. v. Blanche*, No. CV 26-865 (RC), 2026 WL 1162794, at *9 (D.D.C. Apr. 29, 2026) (finding that "[t]he lack of recent" First Amendment harms "undermine[d]" the plaintiff's "claim of imminent future injury"). Although OPR has closed its investigation of Mr. Streever, the Warning Notice remains active.

law enforcement would do. *See id.* at 105. Would police arrest Mr. Lyons again, and would police use an illegal chokehold during that arrest? To state a claim, Mr. Lyons would have needed to allege that he would have another "encounter" with police and either "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter . . . or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105–06. Defendants argue that Mr. Streever's claim here likewise depends on whether Mr. Streever will speak out against ICE again and whether OPR will investigate him for that speech, and Mr. Streever cannot meet the strict test set forth in *Lyons* for such claims.

Defendants' *Lyons* argument misapprehends the nature of Mr. Streever's asserted injury. Mr. Streever is not merely alleging that he will be injured at some point in the future because he will face an investigation or prosecution down the line. That would be closer to the risk of being subjected to a chokehold in the future in *Lyons* because it would rely on predicting the future actions of Mr. Streever and law enforcement. *Cf. Clapper*, 568 U.S. at 414 n.5 (rejecting standing where the future injury depending on an "attenuated chain of inferences").

Mr. Streever's injury is the loss of his freedom to engage in political speech *now* because the threat of such an investigation or prosecution looms over him like the sword of Damocles, and he is forced to self-censor under that threat. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (finding standing based in part on "current self-censorship" in the wake of a civil investigative demand from the Texas Attorney General); *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 87 (3d Cir. 1991) (distinguishing *Lyons* because the case before it dealt with a "threat of" harm (emphasis omitted)).[16] That loss of speech is both

---

[16] Defendants would distinguish *Hospital Council* because "no one said that if Streever again wrote an email to Todd Lyons that he would be arrested, prosecuted, or otherwise

imminent and certain because it does not rely on Defendants actually opening a new investigation. The Warning Notice works because Mr. Streever is too intimidated by the *threat* of future government action that he will not test whether the government will follow through on its threat. As the Supreme Court recently explained, "[t]he value of a sword of Damocles is that it hangs—not that it drops." *First Choice*, 608 U.S. at 192 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting)).

Defendants respond that Mr. Streever's alleged harm from self-censorship is not good enough because such self-inflicted injuries provide no basis for standing. *See* Defs.' Opp'n at 19 (citing *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). Once again, *First Choice* supplies the answer. The New Jersey Attorney general made the same argument in that case, even citing one of the same precedents. *See First Choice*, 608 U.S. at 193. The Supreme Court turned the argument aside, pointing out that *Laird* involved a plaintiff alleging their rights had been chilled "not by any specific action against them, but by the mere existence, without more, of a government program they thought was inappropriate or dangerous." *Id.* (cleaned up). *First Choice* was different because the "Attorney General targeted First Choice for investigation" and the subpoena was "backed by the threat of court-ordered compliance." *Id.*

The D.C. Circuit reached the same conclusion a year earlier. It distinguished all the cases that Defendants rely on as "involv[ing] plaintiffs claiming a chilling injury based on their fear that general government policies *might* apply to them." *Media Matters*, 138 F.4th at 581 (emphasis added). That differed from cases where the government "was investigating or imminently planning to investigate the plaintiffs." *Id.* at 581–82.

---

punished." Defs.' Mot. at 17. As explained above, however, the Court finds that the letter did threaten Mr. Streever with future prosecution if he continued to speak out.

Here, as in *First Choice* and *Media Matters*, Defendants have singled out Mr. Streever based on his past criticism of government officials. True, Mr. Streever is not currently being investigated, nor is he the current target of a subpoena. But the Warning Notice, which threatens future prosecutions against him specifically if he continues to exercise his right to political speech, remains active. That suffices to differentiate Mr. Streever's claim from a "subjective 'chill'" because it makes his chill objectively reasonable. *Laird*, 408 U.S. at 13. "People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Bantam Books*, 372 U.S. at 68

Still not enough, say Defendants, because even if Mr. Streever's speech is being chilled, he does not allege any concrete plans to engage in potentially targeted speech in the immediate future. *See* Defs.' Opp'n at 17. As Defendants point out, the Supreme Court has held that "'some-day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" necessary for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). Here, Mr. Streever does not allege specific statements he would make but for Defendants' actions.

But *Defenders of Wildlife* dealt with a future injury—an "intent" to visit Sri Lanka, where the affiant would presumably behold harms to endangered species, but with "no current plans" to travel there. *Defs. of Wildlife*, 504 U.S. at 563–64. Mr. Streever, by contrast, does not merely allege that he wants to speak out someday in the future. He wants to speak *now* and is currently self-censoring his speech. *See* Compl. ¶ 110 ("Streever *has* self-censored some speech on social media . . . ." (emphasis added)); *id.* ¶ 113 ("Streever fears . . . that if he *continues* to engage in expression sharing his views about and to government officials, he will be subject to further coercive and retaliatory acts . . . ." (emphasis added)).

Even viewed through the lens of a future injury, Mr. Streever's case is distinguishable from those cited by Defendants because the type of speech at issue here is different. Mr. Streever seeks to engage in speech through off-the-cuff emails and comments on social media. *See id.* ¶ 110. This spontaneous speech is different in kind from the sorts of premediated future activities for which courts have expected concrete plans. *See, e.g.*, *Defs. of Wildlife*, 504 U.S. at 563–64 (concerning international travel); *Zieper*, 111 F. Supp. 2d at 489 (involving the creation of documentaries and hosting of exhibitions); *Advocs. for Hum. Rts. v. Blanche*, No. CV 26-865 (RC), 2026 WL 2607203, at *9 (D.D.C. Sep. 3, 2026) (addressing regularly scheduled court visits through volunteer programs). Given the spontaneous nature of the speech at issue here, it would be pedantic to require Mr. Streever to detail exactly when he anticipates speaking out against the government next and what he plans to say.

**2. Likelihood of Success on the Merits**

With venue and jurisdiction resolved, the Court now turns to the preliminary-injunction factors, starting with Mr. Streever's likelihood of success on the merits. Mr. Streever raises both a First Amendment coercion claim and a First Amendment retaliation claim. Mr. Streever therefore must clearly show that he is likely to succeed in proving that Defendants either tried to coerce him into abandoning his First Amendment rights or retaliated against him for his exercise of those rights. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

*a. Duplicity*

At the outset, Defendants urge the Court to dismiss Mr. Streever's coercion claim because it duplicates his retaliation claim, but the Court is not convinced that it is prudent to do so, at least at this juncture. First Amendment coercion and retaliation claims can be analytically distinct. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 201–02 (2024) (Jackson, J.,

concurring) (distinguishing the analytical frameworks for the two kinds of claims). Moreover, because on a motion for preliminary injunction courts make only preliminary determinations, it strikes the Court as inappropriate to render final judgment on one of Mr. Streever's claims. *See Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1042 n.14 (D.C. Cir. 1989) ("The court ruled on a motion for a preliminary injunction; the matter, therefore, was decided only tentatively, not definitively."). After all, Defendants have not moved to dismiss, or for judgment on, any of Mr. Streever's claims (aside from the venue motion which the Court has already denied).

That said, the Court need not address Mr. Streever's retaliation claim today. Mr. Streever "may obtain[ ] all the relief to which [ ]he is entitled by virtue of succeeding on [his] First Amendment [coercion] claim." *Bailey v. Fed. Bureau of Prisons*, 780 F. Supp. 3d 96, 124 (D.D.C. 2025). It therefore does not matter for purposes of the preliminary injunction whether he succeeds on one or both claims. For the same reason, the Court need not address Mr. Streever's argument that his speech is also protected by the right to petition his government.

*b. Coercion*

Defendants wisely do not contest that Mr. Streever's January email constitutes protected expression or that similar speech would be protected. *See* Defs.' Opp'n at 24. Mr. Streever's email addressed salient political decisions to a government official, an arena where the First Amendment's speech protections reach their "zenith." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 187 (1999) (quotation omitted). More importantly, the email does not contain a physical threat. The email registered displeasure with Acting Director Lyons's official conduct, forecasted that the Acting Director will lose favor with the President, and warned that the moral weight of the Acting Director's actions will haunt him in the future. *See* Compl., Ex. 2.

Although Mr. Streever's email was not kind, and may not have been particularly productive, it was a far cry from a "[t]rue threat[ ] of violence" sufficient for the email to shed its First Amendment protections. *Counterman v. Colorado*, 600 U.S. 66, 72 (2023).

The only part of Mr. Streever's coercion claim that Defendants dispute on the merits is whether Defendants engaged in coercion. *See* Defs.' Opp'n at 25. Defendants maintain that a mere investigation is not coercive. *Id.*[17]

As the Court has already explained, however, Agents Henry and Brodie went beyond mere investigation—especially when they issued the Warning Notice. When distinguishing "between permissible attempts to persuade and impermissible attempts to coerce," courts must consider whether the conduct, "viewed in context, could be reasonably understood to convey a threat of adverse government action." *Nat'l Rifle Ass'n*, 602 U.S. at 188, 191. Some useful indicia include the government's tone, whether the government could take action against the plaintiff, the perception of a threat, and whether the government references adverse consequences. *See id.* at 189.

Applying this standard, Mr. Streever is likely to succeed in showing that Defendants engaged in coercion, rather than persuasion. OPR did not ask kindly if Mr. Streever would tone down his rhetoric. It dispatched two agents to his home for an unannounced visit where they delivered a "**WARNING NOTICE**." Compl., Ex. 2 (emphasis in original). Although that notice "request[ed]" that Mr. Streever "discontinue" his political expression, it characterized that

[17] Defendants devote much of their merits briefing to the argument that Mr. Streever failed to plead that a retaliatory motive caused their treatment of Mr. Streever. *See* Defs.' Opp'n at 26–27. Because retaliatory motivation is not a necessary element of Mr. Streever's coercion claim (as distinguished from his retaliation claim, which the Court does not reach), the Court need not address this argument. *See Nat'l Rifle Ass'n*, 602 U.S. at 202 (Jackson, J., concurring) (explaining that stopping "someone else's speech obviously implicates the First Amendment" without mentioning a retaliatory motive).

political expression as potentially violating federal law which "***could subject [him] to both federal and state prosecution***." *Id.* (emphasis in original). The notice practically shouts that Mr. Streever may be prosecuted if he continues to engage in his political speech. Even if Defendants' benign explanation of the notice were plausible, Mr. Streever "reasonably understood [the notice] to convey a threat of adverse government action," namely prosecution. *Nat'l Rifle Ass'n*, 602 U.S. at 191. And no one disputes that prosecution would constitute an adverse government action for First Amendment purposes. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015) (holding that "threats of prosecution" from a sheriff constituted coercion under the First Amendment). Mr. Streever is therefore likely to succeed on the merits of his claim.

### 3. Irreparable Harm

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). An injury is irreparable if it is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). By beyond remediation, courts mean that the plaintiff cannot reasonably be made whole after the fact, for example, with an award of damages. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (per curiam)).

Mr. Streever has shown that he will suffer irreparable harm absent an injunction. The core of Mr. Streever's claim is the loss of his freedom to engage in political expression. The inability to engage in protected speech is an irreparable injury because damages awarded after the fact do not adequately remedy the plaintiff's injury from the censorship. *See Media Matters*, 138 F.4th at 585 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). Defendants do not argue otherwise.

Instead, Defendants reprise their argument that Mr. Streever raises only past injuries and therefore cannot establish that he will suffer a future irreparable harm. As the Court has already explained, however, the Warning Notice establishes a continuing injury, and because that injury is the censorship of Mr. Streever's speech, it is irreparable.

**4. Balance of Equities**

The balance of equities favors relief.[18] "[T]here is always a strong public interest in the exercise of free speech rights" against unconstitutional infringements, not to mention Mr. Streever's personal interest in safeguarding his political expression. *Pursuing Am.'s Greatness*, 831 F.3d at 511; *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").

Defendants insist that the equities weigh against a preliminary injunction because such an injunction would intrude on the effective operation of law enforcement. They posit that this

[18] The Supreme Court has recently intimated that a party seeking a stay need not establish that the equities favor relief but only "that the balance of the equities does not counsel against relief." *Trump v. California*, 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026) (per curiam). To the extent the Supreme Court intended this language to alter the familiar standard for a stay, it would run against the grain of even very recent Supreme Court decisions. *See, e.g.*, *Trump v. Cook*, 146 S. Ct. 2234, 2246 (2026) ("The applicant must show . . . that the balance of equities tip in its favor."). The application of either standard would not change the outcome here.

interest is especially important because of the "dramatic increase in threats to public officials, including the President, Cabinet officials, judges, and law enforcement officers." Defs.' Opp'n at 34.

The Court is mindful of the public interest in effective law enforcement within constitutional bounds. As the Court sees it, however, Defendants' concern goes to the scope of the injunction. Because, as explained below, the Court will not grant a preliminary injunction that enjoins all future investigations into Mr. Streever, Defendants' asserted interest carries less weight than Mr. Streever's and the public's interest in protecting political expression from government infringement. Thus, Mr. Streever has made a clear showing satisfying each of the preliminary-injunction factors, and the Court will award him a preliminary injunction.

In a final bid to forestall an injunction, Defendants argue that Mr. Streever impermissibly seeks final relief in a preliminary posture. *See* Defs.' Opp'n at 28–29. The Third Circuit has cautioned that the "primary purpose" of a preliminary injunction is to preserve the parties' relative positions until trial, but courts have "strayed from [this purpose] and started using preliminary injunctions just to prevent harm." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200–01 (3d Cir. 2024). "Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." *Id.* at 201 (quoting 11A *Wright & Miller's Federal Practice & Procedure* § 2948.1 (3d ed. 2013)).

The Court acknowledges the Third Circuit's concern, but in this case, some preliminary injunctive relief is warranted because the Court may be unable to grant effective relief later. *See id.* To begin, the Court finally determines nothing in this decision, and it does not award Mr. Streever, even preliminarily, all the relief he seeks. The Court merely orders the temporary

vacatur of the Warning Notice and preliminarily enjoins Defendants from issuing similar threats to Mr. Streever or from making good on the threats in the Warning Notice while the case continues. Failure to do so would allow the censorship of Mr. Streever to endure during the case, something this Court would be largely unable to remedy afterward and which would undermine Mr. Streever's position while the case proceeds. In fact, allowing the continued censorship of Mr. Streever during these proceedings could be tantamount to defeat for Mr. Streever depending on how long final resolution takes because Mr. Streever alleges a desire to speak out about a political issue that is particularly salient *now* but might not be as critical a year or two in the future. *See* Compl. ¶ 109 (emphasizing Mr. Streever's fear to express "his views on the morality of the federal government's activities in enforcing immigration law, one of the defining political and social issues driving discourse in the United States"). Moreover, the immediate interim period may be of particular importance to Mr. Streever because the speech he seeks to engage in is political, and there is an upcoming federal election just a couple of months away. Thus, even under the Third Circuit's understanding, a narrow preliminary injunction is appropriate here to stave off censorship during the election cycle and while the issue on which Mr. Streever wishes to speak is most salient.

**C. Remedy**

Because the Court will grant Mr. Streever's request for a preliminary injunction, the next question is what the scope of that preliminary injunction should be. Mr. Streever asks for an order enjoining Defendants "from taking any actions, formal or informal, to coerce, threaten, retaliate against, or intimate repercussions directly or indirectly to Streever due to his protected speech or petitioning activity." Proposed Order Granting Mot. Prelim. Inj. at 2, ECF No. 9-3. Mr. Streever appears to understand that to mean that Defendants could not investigate him in

connection with any of his protected activity. As the Court has explained above, it cannot enjoin the past investigation into Mr. Streever's January email because that investigation has closed. Still, Mr. Streever insists that he needs protection from future investigations involving other speech because those investigations could be used to harass him for the exercise of his First Amendment rights.

The Court is unsure whether it could grant Mr. Streever an injunction covering all future investigations into his protected speech. Generally, courts enjoin a particular investigative demand, rather than enjoining an investigation itself. For example, the Supreme Court recently decided a case involving a subpoena demanding that a nonprofit turn over the identifies of its donors. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 180 (2026). Similarly, the D.C. Circuit has affirmed a preliminary injunction enjoining the enforcement of a specific civil investigative demand seeking internal documents. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 8 (D.D.C. 2024) ("Plaintiffs are before this court seeking an order that preliminarily enjoins Defendant from enforcing the CID."), *aff'd* 138 F.4th 563 (D.C. Cir. 2025).[19] And the Supreme Court has enjoined issuance of a notice declaring certain publications unlawful. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61 (1963). These cases strike the Court as akin to Defendants' Warning Notice, which the Court will temporarily vacate and preliminarily enjoin the issuance of similar threats against Mr. Streever.

[19] To be sure, when affirming that decision, the D.C. Circuit recognized that "'all investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups,' and that bad faith use of investigative techniques can abridge . . . First Amendment rights." *Media Matters*, 138 F.4th at 580 (quoting *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978)). But even so, the injunction there concerned a specific investigative demand as noted above, and it did not contemplate enjoining future investigations into other acts.

Other cases involve pre-enforcement challenges to a law that is itself unconstitutional. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (recognizing that a "well-founded fear that the law will be enforced against them" was sufficient to allow plaintiffs into court). In those cases, the remedy is to enjoin enforcement of the unconstitutional law.

Both these situations are a far cry from enjoining all future investigations into yet undetermined conduct regarding a law that is constitutional, even if the conduct being investigated does not amount to a true threat in the constitutional sense. For one thing, Defendants argue that they have a legitimate interest in investigating even threats that do not rise to the level of a prosecutable offense as due diligence to ensure that no future criminal act will occur, even if they do not intend to charge the speaker with a criminal threat. *See* Defs.' Opp'n at 27; *Comm. in Solidarity with the People of El Salvador v. Sessions*, 705 F. Supp. 25, 29 (D.D.C. 1989) ("It is well settled that 'the FBI would not be violating the First Amendment itself if it decided to investigate a threat that was not so immediate as to permit punitive measures against the utterer.'" (cleaned up) (quoting *All. to End Repression v. City of Chi.*, 742 F.2d 1007, 1015–16 (7th Cir. 1984) (en banc))).

Moreover, law enforcement officers—like the rest of us—are generally free to approach a home, knock on the door, and briefly wait for a response, as Agents Henry and Brodie did, regardless of whether they are investigating a crime. *Florida v. Jardines*, 569 U.S. 1, 8 (2013) ("Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). Homeowners are likewise free to refuse to speak with law enforcement.[20]

[20] Of course, if the government wants to take its investigation a step further, for example by searching Mr. Streever's home or effects, the Fourth Amendment's protections would kick in, and the government would be required to muster some evidence and present that evidence to a

Because the Court is unsure whether it is appropriate to preliminarily enjoin a swath of potential future investigations, the Court declines to do so here. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court must therefore exercise some discretion in determining the proper scope of any preliminary injunction. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam)). In this case, the Court concludes that enjoining all future investigations into other conduct, even if the conduct turns out to be protected, would be inappropriate at this early juncture.

The Court will therefore focus its injunction on the Warning Notice and the January email. The Court will, for the time being, vacate the Warning Notice; it will preliminarily enjoin Defendants from relying on the Warning Notice and Mr. Streever's January email in future prosecutions and investigative demands; and it will preliminarily enjoin Defendants from issuing similar warnings to Mr. Streever that suggest he cannot engage in non-threatening criticism of the government.

Defendants ask the Court to narrow the injunction even further. They claim any injunction "should only apply to the three special agents who allegedly engaged in interactions with Streever and his wife." Defs.' Opp'n at 35. They also suggest that the injunction should be limited to "action based solely on the January email and the Warning Notice." *Id.* at 36.

---

neutral authority. *See* U.S. Const. amend. IV. Perhaps at some point repeated unwarranted intrusions could amount to harassment, but the record here—a single home visit, attempting to speak with Mr. Streever at his hotel, and a few phone calls—does not rise to that level.

The Court disagrees. Limiting the injunction to only the three agents that interacted with the Streevers would render the injunction feckless. Defendants could simply assign a different agent. Moreover, the Warning Notice specifically references not just the agents at the scene but also "the local OPR field office," which is in Virginia and appears to cover the entire eastern seaboard. Compl. Ex. 2; Defs.' Mot. at 4. As for limiting the relief to only the Warning Notice and January email, the Court has largely acceded to that limitation but finds that it is important to give the injunction some room to cover similar attempts to threaten Mr. Streever not to engage in political expression—lest Defendants issue a Warning Notice 2.0 while the case proceeds or prosecute Mr. Streever based, in whole or in part, on the January email.

To the extent Defendants are concerned about an injunction against prosecuting Mr. Streever or issuing to him future investigative demands based on the January email, the Court notes that this requirement imposes minimal burden on Defendants given that they appear to have conceded, at least for present purposes, that the January email is protected activity. In any event, this relief goes no further than preventing Defendants from carrying out the threat in the Warning Notice.

**D. Bond**

If there is to be a preliminary injunction, as the Court has determined there is, Defendants insist that Mr. Streever should be required to post a bond. *See* Defs.' Opp'n at 37. Fed. R. Civ. P. 65(c) states that courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The D.C. Circuit has recently "clarif[ied] that injunction bonds are generally required" even for injunctions against the government. *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025

WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). District courts, however, retain discretion to "dispense with any security requirement whatsoever where the restraint will do the defendant no material damage, where there has been no proof of likelihood of harm, and where the applicant for equitable relief has considerable assets and is able to respond in damages if (defendant) does suffer damages by reason of (a wrongful) injunction." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (cleaned up).

The Court exercises its discretion to dispense of the security requirement in this case. Defendants have not identified any costs or burdens they will incur due to the injunction for which an injunction bond might provide security. Nor have they suggested what amount of bond they would need. At any rate, in the Court's view, it has sufficiently narrowed the preliminary injunction such that Defendants will not suffer any material damage during the pendency of this case. *See id.* The Court merely prohibits Defendants from issuing unconstitutionally coercive threats and prosecuting what Defendants have conceded is protected activity; it does not infringe on their investigative capabilities. The Court finds that it is exceedingly unlikely that this injunction will require Defendants to expend additional law enforcement resources or incur other costs because they cannot issue further unwarranted Warning Notices to Mr. Streever.

## IV. CONCLUSION

Mr. Streever has a right to express his political views through non-threatening speech, however degrading the speech might be. Because Defendants have likely infringed on that right by threatening Mr. Streever that if he did not discontinue his criticism of government officials he might be prosecuted, the Court will grant Mr. Streever a limited preliminary injunction to preserve his ability to exercise his constitutional rights while this case proceeds.

The Court is mindful of Defendants' concern for the marked rise in threats against law enforcement and public officials, part of a concerning trend in recent years. The Court has therefore narrowed the requested preliminary relief to permit Defendants to conduct investigations into future conduct to ensure the safety of law enforcement and public officials so long as they do not issue threats to Mr. Streever deterring protected speech, such as the Warning Notice. At Defendants' request, the Court will stay its ruling for fourteen days to allow Defendants, if they choose, time to appeal and seek a stay of this order from the appellate court. After fourteen days, the injunction will automatically take effect, absent further order from this Court or a higher court. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 15, 2026

RUDOLPH CONTRERAS
United States District Judge